IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

August 3, 2021 Session

**STATE OF TENNESSEE v. MARCUS MALONE**

**Appeal from the Criminal Court for Shelby County**
**No. 17-03640     W. Mark Ward, Judge**

_____

**No. W2020-00364-CCA-R3-CD**

_____

The Defendant, Marcus Malone, appeals as of right from his convictions for second degree murder, attempted first degree murder, five counts of attempted second degree murder, twelve counts of aggravated assault, six counts of employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon, for which the trial court imposed an effective sentence of one hundred thirty-three years. The Defendant contends that (1) the trial court erred by denying the Defendant's motion to suppress his police statement; (2) the trial court erred by failing to inquire into the Defendant's request for substitute counsel; (3) the trial court erred by instructing the jury on criminal responsibility and by failing to instruct the jury on facilitation or self-defense; (4) the evidence was insufficient to establish his identity as the shooter; (5) his sentence is excessive; (6) the trial court erred by imposing partial consecutive service; and (7) his aggregate sentence is unconstitutional in light of his status as a juvenile at the time of the offenses. After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Michael E. Scholl (on appeal), Memphis, Tennessee; Phyllis L. Aluko, District Public Defender; and Elbert E. Edwards, III, Mary Kathryn Kent, Ben Rush, Jr., and Laurie S. Sansbury (at trial), Assistant District Public Defenders, for the appellant, Marcus Malone.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Austin B. Scofield and Carla L. Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from a November 1, 2016 shooting at Zodiac Park in Memphis, in which sixteen-year-old Alana Tello[1] was killed, eighteen-year-old Matthew Turner was shot and paralyzed, and Taylor Bumpous, Summer Jones, Elizabeth Clasen, and Lindsey Trentham were injured.[2] The Defendant was seventeen years old at the time of the incident.

The July 2017 term of the Shelby County Grand Jury subsequently issued an indictment charging the Defendant as follows:

| Count | Charge | Victim | Felony Class |
|---|---|---|---|
| 1 | Second degree murder | Alana Tello | A |
| 2 | Attempted first degree murder | Matthew Turner | A |
| 3 | Attempted second degree murder | Taylor Bumpous | B |
| 4 | Attempted second degree murder | Summer Jones | B |
| 5 | Attempted second degree murder | Elizabeth Clasen | B |
| 6 | Attempted second degree murder | Lindsey Trentham | B |
| 7 | Attempted second degree murder | Taylor Stull | B |
| 8 | Attempted second degree murder | Victoria Cottam | B |
| 9 | Attempted second degree murder | Anna Rutherford | B |
| 10 | Attempted second degree murder | Anna Farris | B |
| 11 | Attempted second degree murder | Andrew Skyler King | B |

[1] Although it is generally the policy of this court to refer to minor victims by their initials, this case involves multiple victims and accomplices, some of whom were minors at the time of the incident, some of whom were adults, and others whose ages were not specified. Moreover, some of the victims share the same initials. In the interest of clarity, we will refer to all witnesses by their given names.

[2] The record contains multiple spellings of Ms. Bumpous's and other witnesses' names; in particular, the indictment refers to "Taylor Bumpus" and "Lindsey Trentman." We have endeavored to refer to the witnesses using the correct spellings of their names as articulated at trial. If we have inadvertently misspelled a witness's name, we intend no disrespect.

| 12 | Attempted second degree murder | Magdalena Cornett | B |
|----|-------------------------------|-------------------|---|
| 13 | Attempted second degree murder | Alivia Richardson | B |
| 14 | Aggravated assault with a deadly weapon causing bodily injury | Matthew Turner | C |
| 15 | Aggravated assault with a deadly weapon causing bodily injury | Taylor Bumpous | C |
| 16 | Aggravated assault with a deadly weapon causing bodily injury | Summer Jones | C |
| 17 | Aggravated assault with a deadly weapon causing bodily injury | Elizabeth Clasen | C |
| 18 | Aggravated assault with a deadly weapon causing bodily injury | Lindsey Trentham | C |
| 19 | Aggravated assault with a deadly weapon causing fear of bodily injury | Taylor Stull | C |
| 20 | Aggravated assault with a deadly weapon causing fear of bodily injury | Victoria Cottam | C |
| 21 | Aggravated assault with a deadly weapon causing fear of bodily injury | Anna Rutherford | C |
| 22 | Aggravated assault with a deadly weapon causing fear of bodily injury | Anna Farris | C |
| 23 | Aggravated assault with a deadly weapon causing fear of bodily injury | Andrew Skyler King | C |
| 24 | Aggravated assault with a deadly weapon causing fear of bodily injury | Magdalena Cornett | C |
| 25 | Aggravated assault with a deadly weapon causing fear of bodily injury | Alivia Richardson | C |
| 26 | Employing a firearm during the commission of a dangerous felony, attempted first degree murder | Matthew Turner | C |
| 27 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Taylor Bumpous | C |
| 28 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Summer Jones | C |
| 29 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Elizabeth Clasen | C |

| | | | |
|---|---|---|---|
| 30 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Lindsey Trentham | C |
| 31 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Taylor Stull | C |
| 32 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Victoria Cottam | C |
| 33 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Anna Rutherford | C |
| 34 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Anna Farris | C |
| 35 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Andrew Skyler King | C |
| 36 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Magdalena Cornett | C |
| 37 | Employing a firearm during the commission of a dangerous felony, attempted second degree murder | Alivia Richardson | C |
| 38 | Reckless endangerment | Matthew Turner, Taylor Bumpous, Summer Jones, Elizabeth Clasen, Lindsey Trentham, Taylor Stull, Victoria Cottam, Anna Rutherford, Anna Farris, Andrew Skyler King, Magdalena Cornett, Alivia Richardson | C |

See Tenn. Code Ann. §§ 39-12-101; -13-102, -103, -210; -17-1324.

## I. Background/Contextual Information

At trial, all of the living victims named in the indictment testified. In addition, the Defendant's accomplices, Jakayle Daniels, Tyler Johnson, and Deric Lucas testified. The Defendant did not testify, but his police statement was introduced and read into evidence by Memphis Police Department (MPD) Sergeant Fausto Frias.

The trial testimony established that on October 31, 2016, Alivia Richardson hosted a Halloween party, which Kirsten Roger[3] attended with her boyfriend, Mr. Daniels, Ms. Roger's friend, Shelby Perser, and Mr. Daniels's friend, Mr. Johnson. Ms. Richardson and her friends disliked Ms. Perser and asked her to leave. Ms. Perser refused, and a fight broke out. By some accounts, Ms. Roger took Ms. Richardson's cell phone, and some witnesses noted that Ms. Roger or Mr. Daniels inadvertently punched Anna Rutherford, who was not involved in the initial fighting. Ms. Rutherford testified that Ms. Roger knocked her out and that Summer Jones, Ms. Rutherford's then-girlfriend, was angry. Ms. Roger, Ms. Perser, Mr. Johnson, and Mr. Daniels eventually left the party.

The following day, a video of the fight was posted on Facebook. Ms. Jones testified that Ms. Roger posted a comment to the video that Ms. Roger "beat all of [them] up"; however, Ms. Rutherford testified that Ms. Roger commented that "she got beat up by a bunch of lesbians[.]" In any event, Ms. Jones and Ms. Roger exchanged insults in text messages and calls, and eventually Mr. Daniels began communicating with Ms. Jones on Ms. Roger's behalf. Ms. Jones challenged Ms. Roger to a fight, and Mr. Daniels suggested they meet at Zodiac Park at about 7:30 p.m.

The testimony and exhibits reflected that Zodiac Park consisted of a long, curved parking lot surrounded by trees; a playground was accessible through one of the wooded areas in the park. The park was adjacent to a neighborhood.

The testimony regarding the shooting will be described below in detail; however, it was undisputed that Ms. Tello was killed when a bullet struck the back of her neck, traveling through her cervical spine, spinal cord, larynx, and esophagus before exiting the front right side of her neck. Mr. Turner was shot in the face and neck and in the back, resulting in permanent paralysis from the chest down. Taylor Bumpous, Ms. Jones, Elizabeth Clasen, and Lindsey Trentham also suffered gunshot wounds.[4]

---

[3] Some witnesses referred to Ms. Roger using other surnames; it is not apparent which surname is correct.

[4] Some of the victims' medical records were entered as stipulated exhibits, but were not included in the appellate record.

Ms. Jones called Matthew Turner and asked him to attend the fight, given that Mr. Daniels would be there. Mr. Turner was with Andrew Skyler King when he received the call, and both young men agreed to accompany Ms. Jones to Zodiac Park. Mr. Turner and Mr. King also brought their respective girlfriends, Ms. Trentham and Anna Farris, to the fight. Ms. Jones also enlisted the help of Ms. Rutherford, Ms. Richardson, Ms. Bumpous, Ms. Tello, Victoria Cottam, Ms. Clasen, Taylor Stull, and Magdalena Cornett. Mr. Turner, Mr. King, Ms. Trentham, Ms. Farris, and Ms. Cornett did not attend the Halloween party and testified that they went to the fight to support one of the parties involved or only to observe. The victims generally testified that they expected a fistfight between young women, although Ms. Jones also brought a taser.

## II. Mr. Daniels, Mr. Johnson, and Mr. Lucas's Version of Events

Mr. Daniels testified that he persuaded Ms. Roger to stay home out of concern for her safety. Mr. Daniels and Mr. Lucas testified that they expected Mr. Daniels to fight a young man chosen by Ms. Jones. However, Mr. Daniels noted that based upon the fight at the Halloween party, Ms. Jones's group was "probably going to try to jump [Mr. Daniels] as well." Accordingly, Mr. Daniels asked Mr. Johnson and another friend, Deric Lucas, to accompany him to Zodiac Park.

Mr. Lucas testified that he called his stepbrother, the Defendant, and requested that he act as security for the fight. Mr. Daniels had previously met the Defendant through Mr. Lucas and stated that they were on good terms.

Mr. Lucas testified that he asked the Defendant if he had a "strap" and that the Defendant responded affirmatively. Mr. Lucas noted that he referred to a "hand held weapon," and he later clarified that he referred to a gun. Mr. Lucas said that he asked the Defendant to bring the gun because Mr. Daniels indicated that he would be "jumped," and Mr. Lucas did not know if the other group would bring a gun. Mr. Lucas also invited Zachary Banks, another friend, to the fight.

Mr. Daniels and Mr. Lucas testified that they expected for Mr. Daniels to fight a young man and were concerned that Ms. Jones's group would "try to jump" Mr. Daniels. Mr. Johnson testified, though, that he thought they were simply going to the park to return Ms. Richardson's cell phone.

Mr. Daniels, Mr. Johnson, Mr. Lucas, Mr. Banks, and the Defendant arrived at Zodiac Park early. Mr. Daniels and Mr. Johnson rode together in Mr. Johnson's gold sedan, and Mr. Banks, Mr. Lucas, and the Defendant rode in the Defendant's vehicle. Mr. Johnson backed into a parking spot inside the park, and they walked through the trees to the playground. Mr. Daniels stated that the Defendant parked closer to the park entrance. Mr. Lucas, Mr. Banks, and Mr. Johnson all reported losing track of the Defendant during this

time. Mr. Daniels testified that he returned to Mr. Johnson's car alone to wait for Ms. Jones's group to arrive. Mr. Daniels admitted that he may have asked the other young men to hide, which Mr. Johnson confirmed. Mr. Daniels did not know if anyone at the fight had a weapon, and he denied telling his group that Ms. Jones's group indicated to him that they had a gun.

Mr. Daniels testified that he wore a "camel like trench coat," blue jeans, sneakers, and a camouflage jacket; Mr. Johnson also stated that Mr. Daniels wore a camouflage jacket. Mr. Daniels denied that he wore a face covering. The day after the shooting, Mr. Daniels turned himself in and gave his clothing to the police, including the camouflage jacket.

Mr. Daniels and Mr. Johnson did not remember at trial what the Defendant wore. Mr. Lucas testified that the Defendant wore dark shorts, a dark jacket, and a red bandana as a face covering. Mr. Daniels told the police that the Defendant wore a black hoodie and a bandana. At trial, Mr. Daniels stated that he thought the other young men in his group all wore face coverings.

Mr. Johnson testified that he wore a red long-sleeved shirt, jogging pants, and sneakers; he denied wearing a face covering. Mr. Lucas stated that Mr. Johnson wore a red hoodie. Mr. Johnson denied telling the police that the Defendant wore a red bandana and black hoodie, and he also denied that the initials on the pages of his police statement were his, although he acknowledged his signature on the last page.

Mr. Lucas testified that he wore a black shirt, jogging pants, and a "headwrap." He denied that he wore a face covering. Mr. Lucas did not recall Mr. Banks's clothing, although he stated that Mr. Banks covered his face.

Mr. Daniels testified that as he sat in Mr. Johnson's car, he saw a group of what appeared to him to be thirty people walking toward the car; he acknowledged that the group might not have been this large. He realized that the situation was serious, and a young woman approached and asked him if he was "the dude talking s--t on the phone." Mr. Daniels rolled down the window as she asked him questions, and he stepped out of the car as the group surrounded it. Mr. Daniels stated that he began to panic and was considering running away; however, he stated that as he talked to the young woman, everyone calmed down and that he felt less threatened. Although Mr. Daniels initially denied giving Ms. Jones the impression that Ms. Roger and Ms. Perser would be at Zodiac Park, he later acknowledged that Ms. Jones's group was surprised that the young women were not present.

Mr. Daniels testified that the Defendant "came out of nowhere" and hit one of the men in Ms. Jones's group. Mr. Daniels noted that no one was fighting when the Defendant

emerged, that "all hell broke loose," and that "everybody started trying to get him." Mr. Daniels began "trying to dip off" as the group pushed and shoved him, and Mr. Turner "tried to pick [Mr. Daniels] up and slam" him to the ground. Mr. Daniels fought Mr. Turner to the ground and averred that he was on top of Mr. Turner when Mr. Turner indicated that he conceded the fight. Mr. Daniels stated that he heard a gunshot, that he and Mr. Turner looked at one another, and that Mr. Daniels ran away. Mr. Daniels denied that he was tased or that anyone else from his group was present during the fighting.

Mr. Daniels testified that he saw the Defendant with his arm raised but denied that he saw a gun in the Defendant's hand or the Defendant's shooting the individual victims. When questioned by the trial court, Mr. Daniels admitted, "I saw him do it. I saw him shooting." He denied knowing that the Defendant had a gun. On cross-examination, Mr. Daniels denied that the Defendant walked up and began firing.

Mr. Daniels testified that Mr. Johnson pulled up beside Mr. Daniels in his car and told him to get inside. Mr. Daniels testified that as they drove away, he asked Mr. Johnson to go back so that he could see what had happened. Mr. Daniels stated that as he walked back to the crime scene, he saw young women crying and holding another woman; when he approached and asked if they were okay, they refused to talk to him. Mr. Daniels saw bodies on the ground, including the young woman who initially confronted him at the car.

Mr. Daniels testified that he saw Mr. Turner on the ground, that he took Mr. Turner's hand and asked if he was okay, and that Mr. Turner asked him to call an ambulance. Mr. Daniels stated that he assured Mr. Turner that help was coming, that he told Mr. Turner, "[Y]ou know I didn't do this," and that he ran away when he heard approaching sirens. Mr. Daniels asserted that he was afraid and panicked.

Mr. Johnson testified that he saw "a big old fight" start between Mr. Daniels and Mr. Turner and that when Mr. Daniels gained an advantage, "they started running down there" and tried to "jump" Mr. Daniels. Mr. Johnson stated that another man swung a punch at him and that he began fighting the man. He said later that he fought two men and that he did not know where Mr. Lucas, Mr. Banks, or the Defendant were. Mr. Johnson heard a taser and a "little flash" going toward Mr. Daniels, although he did not see who was tased. Subsequently, Mr. Johnson saw a gun being fired into the air. Mr. Johnson identified the Defendant as the shooter; he noted that he did not know the Defendant had brought a gun.

Mr. Johnson testified that he ran to his car and collected Mr. Daniels. Mr. Johnson denied that Mr. Daniels went back to the crime scene or spoke to anyone, and he said that they "left the scene immediately." He noted that Mr. Daniels held up a young woman who had been shot in the leg and wanted to help her, but Mr. Johnson told him that the police would arrest him, saying, "They're going to try to put it on you. It's time for us to go."

Mr. Johnson agreed that he tried to protect Mr. Daniels during the fight; however, he denied that he would lie to protect Mr. Daniels.

Mr. Lucas testified that he heard Mr. Daniels "rumbling" and talking to someone; when he walked into the parking area, he saw a group surrounding Mr. Daniels. He denied seeing the fight start or anyone being tased. Mr. Lucas did not participate in the fighting. Mr. Lucas averred that he, Mr. Johnson, and Mr. Banks came out into the parking lot area, that he heard a taser, and that he heard gunshots about ten seconds later.

Mr. Lucas initially denied seeing who shot the gun, but after refreshing his recollection using his police statement, he identified the Defendant as the shooter. Mr. Lucas saw the Defendant fire a gun twice into the air and aim at the crowd while standing in the middle of it. Mr. Lucas ran back to the Defendant's car, as did Mr. Banks.

Mr. Lucas acknowledged that he initially told the police that he rode to Zodiac Park with Mr. Johnson and Mr. Daniels and that he "ended up telling the truth." Mr. Lucas did not identify any additional falsehoods in his police statement.

Mr. Daniels and Mr. Johnson testified that later that night, Mr. Johnson, Mr. Daniels, and Mr. Lucas met at Mr. Lucas's house and tried to piece together what had happened. When asked whether they "decided" that the Defendant "must have been" the shooter, Mr. Daniels responded, "It wasn't . . . like we pick[ed] and chose, it's just . . . that's what happened." Mr. Daniels acknowledged his police statement that he "decided" the Defendant was the shooter and that he never saw a gun. He said, though, that "nobody got together and said we're going to kill some people [then] put it on [the Defendant], that never happened." Mr. Lucas did not recall Mr. Johnson and Mr. Daniels's visit to his house or Mr. Daniels's discussing talking to the police, although he acknowledged that these details appeared in his police statement.

After the shooting, on November 2, 2016, Mr. Lucas gave a police statement and identified a photograph of the Defendant. Mr. Lucas signed the photograph and wrote, "This is Marcus Malone. Marcus ended up sending shots in the air, then he fired at the crowd."

III.   *Victims' Versions of Events*

Ms. Jones testified that after exchanging text messages and calls with Ms. Roger, a man called her and asked to meet at Zodiac Park; she opined that the voice sounded like Mr. Johnson. After meeting at a McDonald's restaurant, Ms. Jones's group traveled to Zodiac Park in three cars and parked in the adjacent neighborhood before walking into the park. The victims agreed that Mr. Johnson's gold sedan was the only car present in the parking lot.

Ms. Jones, Ms. Rutherford, and Ms. Richardson testified that Mr. Johnson got out of the car and that he was wearing a camouflage jacket. Ms. Rutherford noted that some of the people there knew him and that she thought they called him by name during the exchange. Ms. Richardson testified that Mr. Johnson had a red bandana hanging from his pants. Ms. Jones and Ms. Richardson stated that Mr. Johnson's face was uncovered and that they recognized Mr. Johnson from the Halloween party. Mr. King stated that he had seen the person in the car previously and that it may have been Mr. Johnson.

Ms. Trentham, however, did not see anyone around or in the car. Ms. Cornett did not identify the man in the car and only stated that he was tall and wore a hoodie. Mr. King also described the man as tall and wearing a hoodie and camouflage pants or a camouflage jacket.

Ms. Cottam testified that she approached the car and asked the man who he was. She stated that they were "kind of laughing" because they didn't know each other. Ms. Trentham said, though, that Ms. Cornett approached the car and asked if the car's occupant was going to get out.

Mr. King said that one of the young women asked the man where her phone was. Mr. Turner recalled the man's arguing with one or more of the young women.

Ms. Farris testified that some of her group walked to the parked car and that others, including herself, Mr. Turner, and Mr. King, stayed back. She saw one of the young women knock on the car window. She stated that two men got out of the car, that Mr. Turner and Mr. King ran to the front of the group, and that "everybody started fighting."

According to Ms. Jones, Mr. Johnson started "bowing up at" them, which referred to making aggressive gestures. Ms. Jones and Ms. Rutherford stated that Mr. Turner exchanged words with Mr. Johnson, and the two began fighting. Ms. Clasen also stated that the man in the car fought Mr. Turner. Ms. Bumpous testified that the man in the camouflage hoodie fought Mr. Turner. Mr. King said that the tall man from the car fought Mr. Turner, although he later stated that he did not recall with whom the man in the camouflage jacket fought. Ms. Cottam said that a fight initially broke out between Mr. Turner and another man she did not recognize. Ms. Clasen testified that "everyone" was fighting and that she stood behind the fight. Ms. Trentham stated that the only people fighting were a black man and Mr. Turner.

Mr. Turner testified that Ms. Jones called to him, that he turned and saw a man walking toward him out of the woods with a red bandana covering his face, and that he and the man started fighting after the man "kind of jumped at [Mr. Turner] and then sw[u]ng." Mr. Turner explained,

[M]e and him like started off and then [Mr. King] kind of went in and then I stopped for a second, and then when I turned around the guy at the car was running at me so I just ducked and then . . . [the guy] kind of slung me toward the ground and got on top of me[.]

Mr. Turner could not describe the man he fought or the man's clothing.

According to Ms. Bumpous, Ms. Jones, Ms. Rutherford, Ms. Cottam, and Ms. Richardson, Ms. Tello tried to pull the man in the camouflage jacket off of Mr. Turner because he was beating Mr. Turner badly. Ms. Jones acknowledged that she tased[5] Mr. Johnson to get him off of Mr. Turner, which Ms. Bumpous, Ms. Rutherford, Ms. Cottam, and Ms. Richardson confirmed. Ms. Trentham affirmed that Ms. Tello and Ms. Jones intervened in the fight, and Mr. Turner recalled that a group of girls "tackl[ed]" the man off of him. Before Mr. Turner could get up, someone was "already on [him]," although he did not know if it was the same person he was initially fighting. As the man was hitting Mr. Turner, he heard gunshots.

Meanwhile, Ms. Jones saw a masked man come out of the wooded area behind her; she stated that the man laughed at them but did not enter the fight. She said that a second masked man came from behind Mr. Johnson's car and began fighting Mr. King, and a third man emerged from an unspecified location. Ms. Cornett recalled that Mr. Turner fought one man and Mr. King fought another. She said that two or three black men were present, that one of them walked out from the wooded area to behind Mr. Johnson's car, and that another man "just . . . appeared."

Ms. Trentham saw someone wearing a green hoodie walk out of the woods to her left as the fight started. Ms. Rutherford stated that an indeterminate number of people wearing dark clothing and masks came out of the woods and that one person who appeared beside her wore a red bandana. Ms. Stull stated that she heard a taser and saw two people run out of the woods wearing black hoodies and red or black bandanas.

Ms. Richardson identified the person fighting Mr. King as Mr. Daniels; she noted that she recognized Mr. Daniels's eyes and hair from the Halloween party. Ms. Richardson noted that two additional people emerged from the wooded area as the shooting began, but she did not see them fire a gun, and she did not recall what they were wearing.

Mr. King testified that a man walked out of the woods wearing a bandana as a mask and that he "jumped at [them] . . . as though he wanted to fight." The man wore basketball shorts and a short-sleeved shirt; Mr. King estimated that the man was about five feet, seven or eight inches tall. Mr. King testified that he hit the man and attempted unsuccessfully to

---

[5] Ms. Jones identified a photograph of her taser, which was a bright pink rectangle.

knock him to the ground. Mr. King said that the man pulled out a gun and that someone said, "[P]op that ho."

Ms. Jones, Ms. Rutherford, Ms. Clasen, Ms. Richardson, and Ms. Trentham also heard someone say, "[P]op them ho's [sic]." Ms. Richardson attributed this statement to Mr. Johnson. Ms. Jones said that the statement came from the direction of the first masked man who had laughed at them. Ms. Stull heard someone say "shoot them b--ches."

### a. Victims' Recollections of Events During and After the Shooting

Ms. Jones testified that Mr. Johnson was still on the ground fighting when the shooting started. Ms. Jones said that as she tased Mr. Johnson, she looked up, saw a gun "in [her] face," looked the shooter in the eye, and turned to run away; the shooter fired the first shot after she began running. She said that the shooter stood behind Mr. Johnson and Mr. Turner. Ms. Jones did not see anyone else with a gun.

Ms. Stull, Ms. Farris, Ms. Cottam, and Ms. Richardson testified that they did not see the shooter or the gun. Ms. Stull and Ms. Cottam heard gunshots. Ms. Clasen stated that she heard a "warning shot" fired into the air. Ms. Farris, Ms. Rutherford, and Ms. Trentham said that they saw gunshots; Ms. Trentham also stated that she did not see the shooter. Ms. Rutherford stated generally that she saw a red bandana when she heard gunshots, although she denied seeing the gun.

Ms. Bumpous testified that after Ms. Tello intervened in the fight with Mr. Turner, Ms. Bumpous grabbed Ms. Tello's hand and told her they needed to leave. As she and Ms. Tello ran away hand in hand, Ms. Bumpous heard someone yell at them to duck, and she heard gunshots. Ms. Tello was shot in the middle of her back, and Ms. Bumpous was shot in the pinky finger, the hip, and both sides of the rear. Ms. Bumpous did not recall whether the shooting began before or after she started to run away, although she also stated that the shooting began when the man in the camouflage hoodie was being tased. Ms. Cottam attempted to aid Ms. Tello, who passed away before the paramedics arrived.

Mr. Turner testified that he saw everyone running and some people dropping to the ground. Mr. Turner stated that a third person walked up to him, pushed "the guys" away, and shot him in the face near the left side of his nose and in the throat. Mr. Turner turned over on his stomach and began crawling away before the person shot him in the back. Ms. Clasen saw the shooter stand over Mr. Turner, who was on his knees on the ground. Mr. Turner said, "[P]lease don't shoot me," and the shooter shot him once in the head. Mr. Turner fell, and the shooter shot him two more times. Mr. Turner stated that his body "collapsed"; Mr. Turner ultimately lost three toes and was paralyzed from the chest down.

Ms. Clasen testified that the second shot she heard hit her in the leg, and she saw bullets strike Ms. Bumpous. Ms. Clasen suffered a shattered femur and a cracked "tip," and she stated that it continued to cause pain at the time of trial. Ms. Jones was shot in the back of her right leg, for which she underwent surgery. Ms. Trentham was shot in the side of her lower right tibia. Ms. Farris saw bullets strike the ground near her feet and was "out of it [she] was so scared." Ms. Cornett was not wounded, but averred that she felt traumatized. Ms. Stull stated that she thought she was about to die.

Ms. Rutherford stated that as she hid with Ms. Cornett and Ms. Jones behind a rock formation, two people pulled up in a gold car and told them, "[W]e didn't mean to shoot you, is everyone okay[?]" Ms. Rutherford did not remember if either of the people were the shooter or any details about their appearance. Ms. Rutherford later said, though, that the car contained three people and that Mr. Daniels, whose face was uncovered, was the one who spoke to them. Ms. Rutherford stated that the men never offered to help them or apologized. After refreshing her recollection with her police statement, Ms. Rutherford maintained that she was uncertain if the shooter was one of the people she saw in the gold car.

Ms. Clasen stated that Mr. Johnson or "somebody" got out of the gold car's backseat, ran around the car, said, "I didn't shoot y'all," and left. Ms. Clasen did not know what the person was wearing.

Ms. Trentham recalled a beige car's "reversing and picking up one of the black men." The man walked back to the rock formation and said, "I'm sorry, I didn't know they were going to shoot[.]" She denied that the man went over to Mr. Turner or Ms. Tello, came close to anyone, or asked if they needed help.

Ms. Farris recalled that a man said, "I'm sorry, I didn't know that they were going to shoot you, shoot at y'all" before running away on foot. Ms. Farris did not look at the man because she was afraid.

Mr. Turner recalled someone walking up to him and saying, "I ain't know this was going to happen." He also said that the man apologized and bent down, although he did not render aid or hold Mr. Turner's hand.

b.  Victims' Descriptions of the Shooter and Police Statements

Ms. Bumpous first averred at trial that there were two shooters, one wearing a camouflage hoodie and a mask, and one wearing a red hoodie and a mask. Ms. Bumpous stated that she did not see anyone matching the shooters' appearance in the courtroom. Ms. Bumpous identified Mr. Daniels as one of the shooters.

However, when pressed by the prosecutor, Ms. Bumpous testified that she "guess[ed]" she did not see the shooter. She stated that the shooter's face was covered from the nose down by a bandana and that the shooter was about six feet tall. Ms. Bumpous noted, though, that she saw Mr. Daniels, who was wearing a camouflage hoodie, with a gun immediately after the shooting. Ms. Bumpous stated that she did not tell the police about having seen the gun because the police told her that they already "had someone who confessed."

Ms. Bumpous acknowledged her November 8, 2016 police statement, in which she stated that Ms. Jones tased the man in the camouflage hoodie and that she saw a man wearing a dark hoodie and red bandana come running out of the woods before she heard shooting. Ms. Bumpous did not tell the police that she saw the shooter or that there were two shooters. On cross-examination, Ms. Bumpous denied that the person she saw wearing a red bandana was the one shooting. An excerpt from Ms. Bumpous' police interview was admitted as a stipulated exhibit; in it, Ms. Bumpous denied seeing the shooting, the shooter, or anyone with a gun.

Ms. Jones testified that the shooter wore a black hoodie and a face covering; after refreshing her recollection from her police statement, she stated that the face covering was a red bandana. Ms. Jones stated that Mr. Daniels wore a red bandana and a black hoodie. Ms. Jones identified Mr. Daniels as the shooter in a November 2, 2016 photographic lineup and wrote, "I just really feel like he's the one I looked right in the eyes." She also identified Mr. Johnson in a separate lineup as the person who "jumped out of the car and started fighting [Mr. Turner]." Ms. Jones stated that she "assumed" the shooter was Mr. Daniels because he was "the person who [she] knew who was there." She affirmed that she did not, in fact, see Mr. Daniels shooting. Ms. Jones maintained that she was not "really sure" who shot her. She did not know which of the three men she saw had the gun. Ms. Jones acknowledged the lineup instructions not to make an identification unless she was certain. Ms. Jones had never met the Defendant before the court proceedings in this case, and she denied that she saw the Defendant with a gun or shooting.

Ms. Rutherford testified that one of the people who came out of the woods was the shooter and that to her recollection, the shooter was not wearing a camouflage jacket. Ms. Rutherford identified Mr. Daniels as the shooter in a November 2, 2016 photographic lineup, on which she wrote, "[T]his is the person I believe was shooting and asked if we were ok." However, she stated at trial that she chose Mr. Daniels's photograph because she knew he was at the park and that she assumed he was the shooter. When asked whether she understood the ramifications of identifying the shooter based upon an assumption, Ms. Rutherford responded that she was in shock, that she witnessed a good friend's death, that Mr. Daniels was the person she recognized as someone she knew, and that the men wore

masks. She said, "So he was there, so how was I supposed to know that he wasn't the one that shot [Ms. Tello]?"

Ms. Rutherford acknowledged her police statement, which referred to multiple men with masks and a man who wore a hooded sweatshirt with the hood partially closed. She told the police that she did not know whether anyone she saw at Zodiac Park was at the Halloween party because their faces were covered and that she did not recall the masks' colors.

Ms. Cottam also identified Mr. Daniels as the shooter in a November 2, 2016 photographic lineup. Ms. Cottam wrote, "This is the person I saw fire gunshots at everyone that was at Zodiac Park with me. I recognize his eyes." Ms. Cottam testified that she and the other witnesses were transported from the crime scene to the police department separately and that they were kept separate and supervised at the police station. Ms. Cottam stated, though, that she did not see the shooter, explaining, "At the time it was a lot of 'he said, she said,' stuff because we were . . . talking to each other a lot and I wasn't sure what I [saw] so I would [go] off what others [saw]." Ms. Cottam noted that at a party before the shooting, Ms. Roger and Mr. Daniels arrived early, and he was "waving around a new piece he got," referring to a gun. She acknowledged the lineup instructions regarding certainty before making an identification.

Ms. Clasen testified that the shooter had a hoodie "tied around his face," which had a "circle pattern" with "muted" green, red, black, and tan spirals. She agreed that she described the pattern to the police as looking like a rug. She stated that the pattern she saw was not camouflage. She was certain the person in the patterned hoodie was the one who shot Mr. Turner. On November 10, 2016, Ms. Clasen identified Mr. Daniels in a photographic lineup as having been at the park that night.

Mr. King acknowledged his police statement that the shooter was six feet tall. However, he maintained that the shooter was the same height as Mr. King, five feet, ten inches, or shorter. He later said, though, that he did not remember whether the shooter was six feet tall or five foot, seven inches tall. Although he did not recall the color of the shooter's clothing, he agreed that if he told the police that the shooter wore a black hoodie, it was accurate.

In an undated photographic lineup, Mr. King identified Mr. Daniels as the shooter and wrote, "This picture looks similar to the gunman who I was fighting with and who started shooting at us." Mr. King stated at trial, though, that he did not recall identifying anyone in the lineup; he said later that he chose Mr. Daniels's photograph because it was the most similar to the shooter, although the photograph was not very accurate in comparison to his recollection of the shooter.

Ms. Cornett stated that although she did not see a person shooting, she saw a man wearing a red bandana over his face with a gun. After refreshing her recollection with her police statement, Ms. Cornett testified that although she told the police that the shooter did not have his face covered, she "[could] say now" that he wore a red bandana. She noted that all of the men wore red bandanas. She stated that although she was unsure whether there were two shooters, the gunfire she saw seemed to come from two guns. Ms. Cornett did not identify the shooter to the police because his face was covered.

Ms. Richardson admitted that she lied to the police and told them that she and Ms. Stull remained outside the park and stayed in her car until the police arrived, that someone said "pop that s--t off," and that three men emerged from the woods armed with a gun and baseball bat. She noted that she was "in shock" and afraid of getting into trouble. She agreed that the police did not threaten her or accuse her of a crime. Ms. Richardson stated that Mr. Daniels wore a red bandana over his face.

## IV.     *Remaining Trial Testimony*

MPD Officers Jarrod Hurst and Tristan Brown testified regarding the police activity at the crime scene; in particular, the police collected seventeen nine-millimeter shell casings. Tennessee Bureau of Investigation Special Agent Kasia Lynch, an expert in firearms identification, determined that the casings were fired by the same gun.

MPD Sergeant Fausto Frias testified that on November 3, 2016, the Criminal Operation Team arrested the Defendant. He stated that the team was "heavily armed" and that some of them carried assault rifles. Sergeant Frias met the Defendant at the police station about 7:15 p.m., when he asked the Defendant if he needed food or a restroom and briefly explained why the Defendant was there. The Defendant's mother, Phoebe Malone, was not initially at the police station, and Sergeant Frias denied speaking to the Defendant further until she arrived.

At about 8:15 p.m., Sergeant Frias read an Advice of Rights form with the Defendant and his mother. Sergeant Frias stated that in 2016, it was not his practice to record interviews. Initially, the Defendant reported being present during the shooting but denied knowing who shot the gun. The Defendant "adamantly denied" being the shooter. After about forty-five minutes of questioning, Sergeant Frias walked out of the room with Ms. Malone and Sergeant Green. Sergeant Frias explained to Ms. Malone that witnesses saw the Defendant shooting and that the officers would confront the Defendant with those statements. After five to ten minutes, Sergeant Frias, Sergeant Green, and Ms. Malone returned to the interview room. When Sergeant Frias confronted the Defendant with the witnesses' statements, the Defendant gave another statement that corroborated the witnesses' statements.

When asked whether Ms. Malone was allowed to speak to the Defendant, Sergeant Frias testified that Ms. Malone's purpose was to make the Defendant feel more comfortable and that she was not permitted to "interfere with the investigation as an attorney would." Sergeant Frias stated that Ms. Malone could have talked to the Defendant and noted that "as a matter of fact, she talked to [him] especially when [the officers] confronted him . . . with the statements from his friends . . . . [S]he wanted to know, she talked, she begged him to tell the truth." He did not recall specifically when she made this declaration. Sergeant Frias noted that in 1,200 homicide investigations, no suspects had confessed to the homicide immediately.

Sergeant Frias reduced the Defendant's second verbal statement to writing. The Defendant's written police statement was read into the record and introduced as an exhibit. The statement contained questions and the Defendant's dictated answers, which were as follows:

Q: Are you responsible for the death of Alana Tello?

A: Yes

Q: Was anybody with you when this Homicide took place?

A: Yes, my stepbrother Deric Lucas, his friend Kel, Deric's friend Zack, and one more of Deric's friends

Q: Tell me in your own words what happened, before, during and after this incident took place.

A: I got off work around 7 pm and received a call from my stepbrother Deric. He told me that Kel needed my help because his girlfriend got jumped, and they was harassing him to fight him. Deric felt like I would have been able to keep them safe, so he asked me to be his security and to bring a strap. I went to Deric's house and when I got there Deric and Zack [were] there, and he told me he was waiting on Kel to pull up. So Kel pulled up with his friend, and they got the location where they wanted to meet the other group of people that jumped his girlfriend. The meeting location ended up being Zodiac Park. We got to the park before the other people and we all decided it might be a lot of them, even though they said it would only be two. So collectively we found stuff to hide our face. I hid my face with the red bandanna, Deric had some type of black scarf, Zack had a t-shirt covering his face. I don't remember what Kel had on his face or Kel's

- 17 -

friend. Kel was sitting in the car. I hid behind Kel's car and the others hid in other parts of the park. We waited for a minute and when the other parties arrived they taunted us, asking where we were and saying we were scared. They arrived about twenty deep, mostly white people and aggressive. They approached Kel['s] car and told him to get out. He got out, that's when I got up and walked to Kel, and two people was looking at me and I said Wassup, and they started swinging punches at me. I was fighting two or three people, I think Kel was fighting one dude. I don't know where everybody else that came with us was at. But I looked up and saw a crowd of people about twenty deep, and got a little scared. I was still fighting two or three dudes when I noticed Kel was getting tased, and then I got more scared and thought I had to protect him. I started firing shots in the air and saw that they still looked aggressive so I started shooting at the crowd. I didn't know how many times, I just was scared that they was coming to get me. I didn't know if they had firearms of their own. Once that happened everybody started screaming and running. I ran to my car and Deric and Zack was already at the car waiting, and I rushed out of the area. I took Deric and Zack home, I took the gun back to the person that gave it to me and I went home.

Q:     Describe the weapon you used during this shooting.

A:     It was a black 9mm.

Q:     Who gave you the weapon to use during the shooting?

A:     I got the weapon from a dude named Zay,[6] he's the big homie

Q:     Describe what you were wearing at the time of this murder.

A:     I had a red bandanna, grey or black hoodie, shorts

Q:     Describe what Kel and Deric were wearing at the time of the Homicide.

A:     I think Kel had on some type of gold jacket, I can't remember what Deric had on

---

[6] Sergeant Frias referred to this person as "Zaf" during his trial testimony, but the written statement reflects that the person's nickname was "Zay."

- 18 -

Q:      Describe the vehicle you were in.

A:      I was in a dark blue 2002 BMW

Q:      Describe the vehicle Kel was in when this homicide took place.

A:      Kel was in a 2 door gold car, I can't remember what type

Q:      Approximately about how far away were you when you began shooting at the victims?

A:      Out about five to ten yards

Q:      How many shots did you fire[]?

A:      I don't know I just kept shooting until the crowd got away

Q:      How many rounds [did] you ha[ve] in the magazine?

A:      I think it was seventeen

Q:      Prior to this incident did you have any type of altercation or problem with the victims?

A:       I didn't have any involvement at all with these victims, I was only trying to help my brother stay safe

Q:      Did anyone order you to shoot at the victim?

A:      I didn't hear anybody say shoot 'em

Q:      Why did you shoot the victim?

A:      I was trying to protect myself, my brother, and his friends from getting hurt

Q:      Did you see anybody in the crowd armed with a weapon?

A:      Yes, I saw a taser for sure but I wasn't sure if I saw a firearm

Q:      Are you in a gang?

- 19 -

A:     I'm not in a gang but I've been hanging around Blood Deuces for a
       month

Q:     Do you have anything else to add to your statement that can help in
       the investigation?

A:     I didn't mean for the situation to happen like it did, I never thought I
       would be killing someone.

Q:     Did [you] give this statement freely and voluntarily without any
       promises, threats or coercion?

A:     Yes

Q:     Can you read and write without the aid of eye glasses?

A:     Yes

Q:     Is there a parent or guardian sitting here with you, if so who?

A:     Yes my mother, Phoebe Malone, is sitting with me

The Defendant initialed each page of the statement, and he and Ms. Malone signed its last page.  Sergeant Frias noted that the term "big homie" was associated with gangs.  The Defendant claimed that he went to the big homie for a gun to keep Mr. Lucas and Mr. Daniels safe.  Sergeant Frias noted that although the Defendant was not a gang member, "he saw this as an opportunity to Gang Street Crip."  Sergeant Frias said that the Defendant described the other group as larger than "they could handle."   The Defendant refused to tell the police Big Homie Zay's real name or how to contact him.  The police never located Big Homie Zay or the gun.  Sergeant Frias denied that the Defendant ever said he just wanted to go home.  Sergeant Frias stated that it took the Defendant between 8:15 p.m. and 10:15 p.m. to tell them what happened. The Defendant also identified photographs of Mr. Lucas, Mr. Daniels, Mr. Banks, and Mr. Johnson.

        Sergeant Frias testified that the Defendant corroborated Mr. Lucas's statement and the victims' description of the shooter's clothing, the caliber of handgun he used, and the seventeen shell casings found at the crime scene.  He denied promising the Defendant that he could go home if he admitted he was the shooter.  Sergeant Frias acknowledged that two victims said Mr. Daniels was the shooter, but noted that all the victims' descriptions of the shooter's clothing matched the Defendant and that Mr. Lucas, the Defendant's

stepbrother, identified him as the shooter. Sergeant Frias stated that the Defendant identified from where he obtained the gun and why, opining that the Defendant "was in the process of trying to get some street credit for the Blood Deuces." He said that the Blood gang's color was red. Sergeant Frias spoke to the MPD gang unit, which never located anyone by the name of Big Homie Zay.

Following the Defendant's motion for a judgment of acquittal, the trial court dismissed Counts 7, 8, 9, 11, 12, and 13 (attempted second degree murder relative to Ms. Stull, Ms. Cottam, Ms. Rutherford, Mr. King, Ms. Cornett, and Ms. Richardson), and Counts 30, 31, 32, 34, 35, and 36 (aggravated assault with a deadly weapon causing fear of bodily injury relative to Ms. Stull, Ms. Cottam, Ms. Rutherford, Mr. King, Ms. Cornett, and Ms. Richardson).

The Defendant did not present any proof. Upon this evidence, the jury convicted the Defendant of the remaining counts of the indictment as charged. After a sentencing hearing, the trial court ordered the Defendant to serve an effective one hundred thirty-three years in confinement. The trial court subsequently denied the Defendant's motion for new trial, and the Defendant timely appealed.

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by denying the Defendant's motion to suppress his police statement; (2) the trial court erred by failing to inquire into the Defendant's request for substitute counsel; (3) the trial court erred by instructing the jury on criminal responsibility but not on facilitation or self-defense; (4) the evidence was insufficient to establish his identity as the shooter; (5) his sentence is excessive; (6) the trial court erred by imposing partial consecutive service; and (7) his aggregate sentence is unconstitutional in light of his status as a juvenile at the time of the offenses. After a thorough review of the record and applicable law, we affirm.

### I. Suppression

The Defendant contends that the trial court erred by denying his motion to suppress his police statement, arguing that he was not read his Miranda rights until after he was questioned; that the statement was coerced in light of his young age, inexperience with the criminal justice system, and the officers' interrogation tactics; and that officers continued questioning him after he told them he did not wish to speak with them. The State responds that the trial court properly denied the suppression motion and determined that the Defendant voluntarily and knowingly waived his rights and gave an admissible confession.

### a. Suppression Hearing Testimony

At the suppression hearing, Sergeant Frias testified that Sergeant Sheila Green asked him to interview the Defendant. Sergeant Frias met the Defendant at 7:15 p.m. after his arrest. He stated that the Defendant was alone in an interview room. Sergeant Frias introduced himself and asked the Defendant if he needed food, water, or a restroom. The Defendant declined, and Sergeant Frias affirmed that the Defendant received any food or drink he asked for throughout the interview. Sergeant Frias met Ms. Malone at the police station lobby, explained what was happening, and asked if she knew anything about the incident. Ms. Malone conveyed that the Defendant was present during the shooting.

Sergeant Frias testified that he, Sergeant Green, and Ms. Malone entered the interview room. Sergeant Frias obtained the Defendant's biographical information and reviewed the Defendant's <u>Miranda</u> rights, including explaining upon the Defendant's request what the word "coercion" meant. The Defendant read the first line of the Advice of Rights form out loud and the rest silently. The Defendant verbally confirmed that he understood his rights and signed the form at 8:05 p.m. Ms. Malone and Sergeants Frias and Green signed the form at 8:15 p.m.

The "Advice of Rights" form was signed by the Defendant, his mother, Detective Greene, and Officer Frias. The top of the form was filled out as having been completed at "2005 hrs," and the bottom of the form was signed by the Defendant, his mother, Sergeant Green, and Detective Frias. An additional time of "2015 hrs" was noted below the signatures. The Defendant's typed statement was signed at 10:50 p.m.

Sergeant Frias testified that during the verbal portion of the interview, the Defendant admitted that he was present at Zodiac Park to help a friend during the fight, although the Defendant denied shooting. Sergeant Frias noted that Ms. Malone was present at all times, and he denied that the Defendant ever asked to stop talking to the officers or conveyed that he did not wish to speak to them.

After the Defendant denied being the shooter, Sergeants Frias and Green left the room accompanied by Ms. Malone. Sergeant Frias obtained a witness statement that the Defendant was the shooter and after five or ten minutes, returned to the interrogation room and confronted the Defendant with the statement. The Defendant admitted to the shooting and was "nervous but remorseful." The Defendant identified photographs of the people with him at Zodiac Park.

Sergeant Frias typed the written statement shortly thereafter at his desk, and he characterized the written statement as inclusive of the Defendant's oral statements. He denied that the Defendant invoked the right to an attorney or to remain silent before

composing the written statement. Sergeant Frias read the Defendant's written statement into the record, which was identical to the one introduced at trial.

Sergeant Frias testified that neither he nor Sergeant Green threatened, coerced, or promised the Defendant anything during the interrogation. The Defendant read over the written statement, initialed each page, and made no changes before signing it. Sergeant Frias stated that the Defendant, Mr. Daniels, Mr. Johnson, and Mr. Banks all identified the Defendant as the shooter.

On cross-examination, Sergeant Frias testified consistently with his trial testimony about the police team that arrested the Defendant. He noted that the team was used for violent offenders and that they carried assault rifles.

Sergeant Frias denied that he told Ms. Malone that she could not speak to the Defendant inside the interrogation room. He also denied that they told the Defendant he could go home if he admitted to the shooting. The Defendant was handcuffed to the chair by his ankle. Sergeant Frias estimated that his initial questioning took about forty-five minutes before the three adults all left the room in order for Sergeant Frias to retrieve the witness statements. He did not recall any occasion in which Ms. Malone left the interrogation room by herself. Sergeant Frias stated that the Defendant was slightly nervous and "alert," which was typical of other witnesses who came to the homicide office. He denied that the Defendant appeared to be cold. Although Sergeant Frias did not recall yelling at the Defendant during the interview, he acknowledged that such behavior would not be unusual.

Darnisha Anderson, the Defendant's supervisor at Walgreens, testified that on November 3, 2016, she was working the front register when a police officer entered and asked her if the Defendant was there. Ms. Anderson responded affirmatively and told him that the Defendant was in the back of the store. The officer signaled and other visibly armed officers entered. About five minutes later, the officers escorted the Defendant out of the store in handcuffs. Ms. Anderson recalled that some of the officers had "long guns" and that she was shocked and confused because it was a public place and customers were in the front of the store, including a woman and her young daughter. Ms. Anderson opined that the officer response was unnecessary and that the store had only one point of ingress and egress. Ms. Anderson described the Defendant as having a blank expression on his face as he left the store, which could have been a combination of fear and not knowing what was happening.

Ms. Malone testified that on November 3, 2016, she was at work when one of the Defendant's siblings called and told her the police were at her house. Ms. Malone returned home, and the police asked for her consent to search the house. She stated that when the

- 23 -

Defendant left for school that day, he told her that he was at Zodiac Park because "someone called him there" but that he had nothing to do with the shooting. After the officers searched the house, Ms. Malone went to the police station. Ms. Malone stated that Sergeant Green and a male detective escorted her to the Defendant and that Sergeant Green instructed her not to speak to the Defendant once they were in the interrogation room. Ms. Malone said that a male detective was already inside the room with the Defendant when she arrived.

Ms. Malone testified that the Defendant was handcuffed to the chair by his arms. She noted that he was shivering, had pulled his arms inside his Walgreens uniform shirt to the degree possible, and looked hurt and sad. Ms. Malone noted that she was wearing a sweater and felt cold. After about five minutes, Ms. Malone looked at the Defendant and burst into tears because she could not stand to see the Defendant in this position. Sergeant Green asked if Ms. Malone wanted tissues and water, and Ms. Malone ultimately stepped out of the room for about five minutes to compose herself. Sergeant Green showed Ms. Malone to the restroom, but Sergeant Frias remained in the interrogation room.

Ms. Malone testified that when she reentered the interrogation room, the Defendant's head was sagging and that he looked "disgusted like someone had just said something to him." She stated that she periodically cried during the interview and that the Defendant also cried. Ms. Malone said that a second break in the questioning occurred for about fifteen minutes, during which time she left the interrogation room. Ms. Malone heard someone yelling, "[H]e know[s] he did it, he just need[s] to admit it. You know you did it, you just need to admit it." She noted that no one had asked the Defendant any questions at this point or advised the Defendant of his rights.

Ms. Malone testified that the officers first asked the Defendant general questions about school, whether he knew Mr. Daniels and Mr. Lucas, and what happened at the park. She denied that the officers had advised the Defendant of his rights at this juncture. According to Ms. Malone, the Defendant answered the questions about school but said that he did not want to talk about the park. Sergeant Frias responded that Mr. Daniels and Mr. Lucas said the Defendant was the shooter, and he urged the Defendant to "[j]ust admit [he] did it." Ms. Malone stated that the Defendant initially did not respond; Sergeant Frias then told him, "[If] you just say you did it, you can go home." Sergeant Frias stood next to the Defendant, raised his voice, and repeatedly told the Defendant that he did it and to say that he did it. The Defendant put his head down and said, "okay."

Ms. Malone testified that the questioning ended and that the officers presented them with an Advice of Rights form along with "all the paperwork." The Defendant read and signed the form in Ms. Malone's presence. For the next hour, Sergeant Green and the

Defendant sat at a desk outside the interrogation room while she asked the Defendant questions for the written statement and typed his responses.

On cross-examination, Ms. Malone testified that she had not watched the news and did not know anything about the shooting. She stated that she and her children had an open relationship and that the Defendant felt the need to tell her that he was there and someone was hurt. Ms. Malone said that the Defendant was preparing to go to school and that she said they would discuss it further after he returned home. Ms. Malone stated that she did not take the Defendant to the police station because she wanted more details first. Ms. Malone said that the Defendant initially told the officers that he was present at Zodiac Park and that he "knew of the shooting so he felt like he was basically part of it. He was there." She denied that the Defendant ever said during the interview that he was the shooter, and she stated that the Defendant only answered "okay" when urged to confess.

Ms. Malone testified that she did not read the hard copy of the typed statement because she listened to the questions and thought the statement reflected "what was said." She stated that the Defendant reviewed "the first part," but she denied that he initialed each page. However, she later identified the Defendant's written initials on the pages of the statement. Ms. Malone noted that as Sergeant Green typed, "[she and the Defendant] were actually reading" the document and that she did not "think to look at it again." Ms. Malone said that although the statement indicated that Sergeant Frias composed it, Sergeant Green did the typing.

Ms. Malone testified that the Defendant never discussed shooting a 9 mm pistol or obtaining a weapon from a person named Zay. She later said, though, that she recalled the Defendant's "saying something about a 9 [mm]" and that the Defendant said he got the weapon from "big homie." She said that when the Defendant was asked if he was responsible for Ms. Tello's death, he did not answer affirmatively, but said that "he was there at the park." Ms. Malone did not recall the Defendant's discussing fighting two or three people at the park or shooting into a crowd. Ms. Malone did not remember whether the Defendant said that he shot in the air, how far he was from the victims, or whether anyone ordered him to shoot the victims. Ms. Malone did not remember the Defendant's saying why he shot Ms. Tello. Ms. Malone denied that the Defendant said how many shots he fired; similarly, she stated that the Defendant claimed not to know how many rounds were in the gun's magazine. She did not remember the Defendant's response when asked whether the statement was freely and voluntarily given and whether he had any other information that could help the investigation.

The trial court instructed Ms. Malone to highlight anything in the typed statement that varied from what she heard the Defendant say during questioning. The marked copy of the statement was not included in the appellate record.

The Defendant testified that on November 3, 2016, before he left for school, he did not feel well and like "something was off." He wanted to tell Ms. Malone what happened at Zodiac Park, but he did not have a chance to go into detail. At the end of the school day, he returned home briefly before reporting to work at Walgreens. At about 6:00 p.m., he came out of the stock room and saw two men with assault rifles come around a corner; his manager was "yelling" at another officer. The Defendant stated that officers ran down the aisles pointing rifles at him and that he was afraid. He followed the officers' instructions and was handcuffed and led out of the building. The officers asked if one of the cars in the parking lot was his; he did not respond, and the officers began searching the car. According to the Defendant, the officers roughly removed the contents of his pockets. The Defendant averred that he was "terrified" and in shock because he did not do anything wrong and did not believe he would be arrested; he noted that he did not know if the officers would "do anything" to him. The Defendant denied that the officers told him that he was under arrest or explained why he was detained. He noted that the officers did not speak to him because they verified his identity using his identification card.

The Defendant testified that he arrived at the police station between 6:15 and 6:30 p.m. He noted that he would normally eat for the first time in a day during his break at work, but that he sometimes forgot. At the time of his police interview, the Defendant had not eaten since 10:00 or 11:00 p.m. the previous evening. The Defendant stated that he was handcuffed to a chair by his leg and that he sat alone in an interrogation room for a long time. He said that he was cold, scared, and did not know what to expect. The Defendant stated that he had never been interrogated by the police or been in a similar situation before. He pulled his arms into his shirt sleeves and tucked his head into his shirt. He denied that anyone offered him food or drink. Eventually, Sergeants Green and Frias entered the room, asked for personal information, and asked the Defendant if he knew why he was there. The Defendant responded that it was about a shooting and that he did not know who was shot. They asked the Defendant what had happened, and he told them that he was at Zodiac Park and that he was not the shooter. The Defendant denied that he had been informed of his rights or that his mother was present at that time. He maintained that he still had not been told that he was under arrest.

The Defendant testified that he was comfortable talking to the officers because he had only hidden and covered his face during the incident. He told them that Mr. Daniels asked him to come to the park and hide. After a break in the questioning, the officers came back, and the Defendant repeated his story. The officers told him that Mr. Lucas identified him as the shooter. The Defendant stated that Sergeant Frias became louder and more aggressive when the Defendant disagreed with him, making hand gestures and pacing across the table from the Defendant. The Defendant noted that his uncle lost a tooth and a cousin's back was broken in encounters with the police and that because of people being "beat and killed by the police," he felt as though Sergeant Frias might lay hands on him.

In an effort not to disagree with Sergeant Frias, the Defendant put his head down on the table and said that he did not want to talk about the shooting because Sergeant Frias was not listening to him.

The Defendant testified that the officers left the room for a short time and that when they returned, a third officer came in and told Sergeant Frias something in his ear. The Defendant said that Sergeant Frias told him that Mr. Lucas "was going to get accessory to murder" and that the Defendant was going to spend the rest of his life in prison and "was never going to go home if [the Defendant would not] tell him what they wanted to hear." The Defendant stated that he was afraid and felt that he had no choice but to do what Sergeant Frias instructed. He explained that when Sergeant Frias asked questions implying an answer with which the Defendant had previously disagreed, the Defendant "just went ahead and said yeah, okay, [he] did it." The Defendant asserted that his statement during this portion of the interrogation was not true because he "was just trying to get home as fast as possible" by telling Sergeant Frias what he wanted to hear.

The Defendant testified that Ms. Malone arrived after the officers asked their first set of questions; he clarified that he referred to the set of questions in which he admitted to being the shooter. The Defendant asked if he could speak to Ms. Malone, and the officers responded negatively. He could not remember if both officers left to escort Ms. Malone to the interrogation room.

Upon questioning by the trial court, the Defendant reiterated that Ms. Malone was not present until he admitted to being the shooter. He revised his statement a moment later, saying that he was mistaken and that Ms. Malone was present when Sergeants Frias and Green asked him for his biographical information. The Defendant averred that after he told Sergeant Frias that he did not want to talk anymore, Sergeant Green "took [Ms. Malone] out for a water break [and] that's when they start[ed] putting more pressure on [him]." The Defendant explained that Ms. Malone and both officers left the room and that before Ms. Malone returned, the officers began asking questions and telling him about Mr. Lucas's being charged with accessory to murder and the Defendant's going to jail for life, which prompted his confession.

The Defendant testified that after his initial agreement that he was the shooter, Ms. Malone returned, and the officers went through the same questions again while Sergeant Green took handwritten notes. The Defendant noted that Ms. Malone was crying and upset and that he knew she did not want to be there. He stated that he felt badly for putting Ms. Malone through "so much stress."

When shown the Advice of Rights form, the Defendant testified that he did not sign the form until "it was close to when [he] thought [he] was about to go home" at the end of

the interview after the typed statement was finished. The Defendant stated that when he asked questions about the form, Sergeant Frias "said it wouldn't matter now, [the Defendant was] pretty much done. So [he] just had to sign it." The Defendant noted that he asked what coercion meant and that Sergeant Frias responded that it was "somebody threatening you." The Defendant averred that he did not pay attention to the content of the form because he thought that he was about to go home. According to the Defendant, Sergeant Frias said, "[T]he quicker you work with us, the quicker you can probably go home," but that if the Defendant did not help the police, he would never go home. The Defendant thought that Ms. Malone was present during this exchange.

When shown the initialed and signed police statement, the Defendant acknowledged his handwriting, although he characterized the statement as "what [he] told the police . . . after [he] tried several times to tell them the truth about it but it wasn't getting [him] anywhere[.]" The Defendant noted again that he agreed with whatever the officers said because he wanted to go home, although "a lot of it wasn't true." The Defendant affirmed that the statement accurately reflected what he said during the interview "after [he] had constantly tried to tell them otherwise." The Defendant said that although the officers gave him an opportunity to review the hard copy of the statement, he and Ms. Malone did not read it before signing it. After the Defendant and Ms. Malone signed the statement, the officers told him that they would send the statement to the prosecutor and that based upon the prosecutor's response, the Defendant may be able to go home. The Defendant felt relieved and believed that he would be able to leave. However, the officers put the Defendant in an interrogation room, provided him with a drink and a snack, and returned and told him that he was being charged with second degree murder, ten counts of attempted second degree murder, and possession of a firearm. The police took Ms. Malone out of the room, and after midnight, they transported the Defendant to juvenile detention.

On cross-examination, the Defendant testified that he never had to repeat a grade in school and that he attended Whitehaven High School, which was one of the best schools in Memphis. He stated that he made generally good grades, although the classes were a little difficult, and he got an F in his English and history class. He affirmed that he was literate. Although he did not have time to watch many television programs, he enjoyed science programs, home improvement programs, and programs about cars. He noted, though, that the interrogation was "a scary event in [his] life."

The Defendant reiterated that he gave two statements to the police. The first statement was that he hid behind Mr. Daniels's car and heard shots, but did not see who did the shooting. Ms. Malone was present for the first statement.

In the second statement, which was taken after Ms. Malone left the room and Sergeant Frias "yell[ed]" at the Defendant for "a while" while making gestures "like he

was going to reach over at any time," the Defendant admitted to the shooting. He noted that he initially denied shooting in the second statement and that at this juncture, the officers confronted him with the witnesses' statements. The Defendant added that when Sergeant Frias asked where he put the gun, the Defendant responded that he did not have a gun and said, "[T]hat's what I was trying to tell you, I wasn't the shooter." Sergeant Frias stated that the Defendant "had to get [the gun] from somebody" and asked if he was in a gang. The Defendant denied being in a gang, and Sergeant Frias replied, "[Y]ou gotta be in a gang. That's why they gave you a gun." The Defendant stated that he "made up a person named Zay because [he] didn't know what else to do." The Defendant said that Sergeant Frias asked him if Zay was the Defendant's "big homie," and Sergeant Frias stated that "it [had] to be [the Defendant's] big homie, [had] to be trying to induct [him] into a gang." The Defendant responded negatively, and Sergeant Frias "kept on pressing [him], yelling at [him], saying [he] was a liar[.]" The Defendant eventually agreed that Zay was his big homie. He noted that he tried to disagree with various statements but that Sergeant Frias "didn't let [him]." The Defendant gave the second statement during a period of between fifteen minutes and one hour.

The Defendant testified that after Ms. Malone returned, Sergeant Frias went over the same questions that he had asked during the second statement. The Defendant decided not to argue with him and to "go ahead with what they said" to finish the interview and "get [Ms. Malone] out of [t]here" and go home together. The Defendant agreed that Ms. Malone was present when the typed statement was composed and when he was advised of his rights. The Defendant agreed that he asked the officers questions about the Advice of Rights form and that although he still did not understand the reference to coercion, he decided to sign the form so that he could go home. He maintained that he initialed and signed the hard copy of the typewritten statement without reading it. The Defendant agreed that although he did well in school, he thought that he would go home after admitting to murder. He explained that the officers told him to cooperate and that they would help him get home.

The Defendant testified that Sergeant Frias's hand movements frightened him. He said that Sergeant Green sat and took notes. When asked whether the prosecutor's gesturing frightened him, the Defendant stated that it was a distraction but that the prosecutor was not yelling at him "with the ferociousness of a male." He noted that while he was growing up, men had threatened him "a lot of times." Upon the trial court's request, the Defendant highlighted the portions of the typewritten statement reflecting false information.[7]

---

[7] The highlighted statements were not included in the record on appeal; however, the trial court described them in its order, which is sufficient for our review.

### b. *Order Denying Motion*

The trial court subsequently entered a March 29, 2019 written order denying the motion to suppress. In the order, the trial court noted that the only section of the written statement Ms. Malone highlighted as not reflecting the Defendant's verbal answer was the Defendant's responding positively when he was asked if he was responsible for Ms. Tello's death. The court stated that defense counsel explained to Ms. Malone that she should highlight every difference between the Defendant's verbal responses and the typed statement. The court found that accordingly, "Ms. Malone's testimony as to the accuracy of the typewritten statement has significant internal conflicts."

Similarly, the trial court recounted that the Defendant highlighted the portions of the statement in which he gave false answers and that the Defendant had not highlighted the following: (1) Mr. Lucas asked the Defendant to help him in a fight; (2) Mr. Lucas asked the Defendant to act as security and bring a strap; (3) The Defendant went to the park, hid his face with a red bandana, and hid behind a car; (4) The Defendant had a 9 mm pistol containing about seventeen rounds; and (5) The Defendant was between five and ten yards from the victims when he began shooting. Relative to the Defendant's hearing testimony, the trial court noted significant discrepancies regarding when Ms. Malone was present during the interrogation.

The trial court found that the Defendant was twenty-four days from his eighteenth birthday at the time of the shooting, that he was in twelfth grade and on track to graduate, that his grades were adequate, that he was never held back or placed in "special" classes, that the Defendant's reviewing the Advice of Rights form reflected his literacy, that he worked at Walgreens, and that no evidence existed to suggest the Defendant was intoxicated, suffered from mental illness, or had a mental disability. The court stated that the Defendant's responses to questions during the interrogation and at the suppression hearing were appropriate and indicated that he was "reasonably intelligent." The court noted that the Defendant had never been subject to a police interrogation previously.

The trial court further found that even though conflicting evidence was presented regarding Ms. Malone's presence during the interrogation, the testimony suggested that she was there for most of the questioning. The Defendant was arrested, questioned, and his statement was complete within a five-hour span. The court noted the conflicting testimony between the Defendant, Ms. Malone, and Sergeant Frias regarding the Defendant's being cold and crying, Sergeant Frias's yelling and gesticulating, the timing of the Advice of Rights form, and the Defendant's articulating that he did not want to talk about the shooting. The court credited Sergeant Frias's testimony and discredited the testimony of Ms. Malone and the Defendant, noting that their testimony would indicate that they signed a form with the incorrect time written on it. The court recalled Ms.

Malone's saying that an hour passed between signing the Advice of Rights form and signing the Defendant's typewritten statement. The court then determined that because it found Ms. Malone and the Defendant willing to lie under oath, when taking into consideration the testimony and the witnesses' demeanor, the preponderance of the evidence established that the Defendant was adequately informed of his <u>Miranda</u> rights, waived those rights voluntarily and knowingly, and gave a voluntary statement free from coercion. Likewise, the court found that the Defendant never invoked his right to remain silent.

### c. Standard of Review

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." <u>State v. Talley</u>, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. <u>State v. Meeks</u>, 262 S.W.3d 710, 722 (Tenn. 2008) (citing <u>State v. Scarborough</u>, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." <u>Id.</u> (citing <u>State v. Berrios</u>, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. <u>Id.</u> (citing <u>State v. Hayes</u>, 188 S.W.3d 505, 510 (Tenn. 2006)).

### d. Fifth Amendment Jurisprudence

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." <u>See also</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "The significant difference between these two provisions is that the test of voluntariness for confessions under [a]rticle I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." <u>State v. Crump</u>, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent conducts a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at

trial unless the State establishes that a defendant was advised of his Fifth Amendment rights and that a defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

### e. Voluntariness/Coercion

Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible. Rogers v. Richmond, 365 U.S. 534, 540 (1961). In order to determine whether a confession was voluntary, a court must consider the particular circumstances of each case. Monts v. State, 400 S.W.2d 722, 733 (1966). Coercive police activity is a necessary prerequisite in order to find a confession involuntary. State v. Downey, 259 S.W.3d 723, 733 (Tenn. 2008). A confession "must not be the product of 'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" Id. at 733-34 (quoting State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000)).

Promises of leniency, however, do not necessarily render a confession involuntary; instead, the critical question is whether law enforcement's actions were of a nature to overbear a defendant's will to resist. State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996). The court must determine "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Hunter v. Swenson, 372 F. Supp. 287 (W.D. Mo. 1974)). Factors in determining voluntariness include the age of a defendant; his level of intelligence and education; his prior experience with law enforcement; repeated and prolonged nature of the questioning; the length of the detention prior to obtaining the statement; the lack of any advice to a defendant of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether he was injured, intoxicated, drugged, or in ill health; whether he was deprived of food, sleep, or medical attention; whether he was physically abused; and whether he was threatened with abuse. State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013).

In this case, the Defendant was less than one month from his eighteenth birthday. He attended a well-reputed high school, made good grades, and had never been held back a grade. The Defendant also worked part-time at Walgreens. He had no experience with law enforcement. No evidence existed that he had a mental disability or illness or that he was intoxicated during the interview.

- 32 -

The Defendant's arrest and questioning lasted about four hours in total. The Defendant stated that he initially was willing to speak to the officers because he had only gone to Zodiac Park and hid. Although the Defendant discussed feeling afraid of Sergeant Frias when he raised his voice and made hand gestures, nothing in the record indicates that the Defendant was physically mistreated or explicitly threatened with violence. We note the trial court's finding that Ms. Malone was present in the interrogation room for most of the questioning. The Defendant was able to read the Advice of Rights form, which included that he could decline to speak with the officers before consulting with a lawyer or stop questioning at any time. The trial court found that the Advice of Rights form was explained and signed prior to the interview.

The trial court credited Sergeant Frias's testimony that he offered the Defendant food and drink, and the Defendant acknowledged that after the interview, he received a snack and drink upon request. In addition, the trial court credited Sergeant Frias's description of the Defendant's demeanor as nervous and alert but "remorseful." The trial court generally discredited the Defendant and Ms. Malone, including their assertions that the Defendant was cold, shivering, and crying during the interview. Further, the court specifically credited Sergeant Frias's testimony that he never told the Defendant that he could go home if he admitted to the shooting. This court is bound by the trial court's factual determinations. Accordingly, the record supports the trial court's conclusion that the police did nothing to overcome the Defendant's will to the degree that his confession was involuntary or coerced. The Defendant is not entitled to relief on this basis.

### f. Knowing and Intelligent Waiver of Miranda rights

Conversely, prior to any custodial interrogation, law enforcement officers are required to warn a defendant that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. See Miranda, 384 U.S. at 479. A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Id. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, a defendant must be adequately apprised his their right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). The State bears the burden of proving by a preponderance of the evidence that a defendant waived his Miranda rights. Climer, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)). Certain factors apply in the determination of whether a waiver of Miranda rights qualifies as voluntary, knowing, and intelligent: the age and background of a defendant; their education and intelligence level; their reading and writing skills; their demeanor and responsiveness to questions; their prior experience with the police; any mental disease or

disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the Miranda rights were explained. State v. Echols, 382 S.W.3d 266, 280-81 (Tenn. 2012) (citing State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000); State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998)).

Relative to the timing of the Miranda warnings, the trial court found that the written notation of the time on the Advice of Rights form, as attested by Sergeant Frias, was accurate. The court discredited the Defendant and Ms. Malone's assertion that the form was not presented to them until the end of the verbal interview. This court may not reweigh the evidence and is bound by the court's finding in this regard. Because the Defendant read and signed the Advice of Rights form before questioning began, no Miranda violation occurred, and he is not entitled to relief on this basis.

Relative to whether the waiver was knowing and voluntary, the Defendant was less than one month from his eighteenth birthday. He attended a well-reputed high school, made good grades, and had never been held back a grade. The Defendant also worked part-time at Walgreens. No evidence existed that he had a mental disability or illness or that he was intoxicated during the interview. The Defendant was able to read the Advice of Rights form, and he asked about terms he did not understand. The Defendant responded appropriately to questions during the interrogation and at the suppression hearing. The Advice of Rights form used plain language to describe the Defendant's rights, and Sergeant Frias explained any unfamiliar concepts as requested. Ms. Malone was also present during most of the questioning. The record supports the trial court's finding that the Defendant was a reasonably intelligent young man and that in spite of his inexperience with law enforcement, he was adequately informed of his rights to make a knowing and voluntary waiver.

### g. Invocation of Right to Remain Silent

That a defendant has a constitutional right to remain silent in the face of accusations against him, not only during his trial but also upon arrest and while in custody, is a rule so fundamental as to require little elaboration. Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976) (citations omitted). When a suspect clearly and unambiguously articulates during a custodial interrogation that he wishes to invoke the Fifth Amendment privilege against self-incrimination, the officers conducting the interrogation must stop questioning the suspect. Crump, 834 S.W.2d at 269 (citing Miranda, 384 U.S. at 473-74); State v. Dotson, 450 S.W.3d 1, 53 (Tenn. 2014) (holding that a defendant's request to speak to another police officer was not an unambiguous invocation of the right to remain silent) (citing Berghuis, 560 U.S. at 381-82 (holding that a defendant's sustained silence during police questioning was not an unambiguous invocation of the right to remain silent)).

As we have noted above, this court is bound by the trial court's findings of fact and credibility determinations at the suppression hearing unless the evidence preponderates against them. The court found the Defendant and Ms. Malone's accounts of the interrogation incredible and specifically credited Sergeant Frias's assertion that the Defendant never expressed unwillingness to continue the questioning. The court stated that based upon the credible testimony, the Defendant never invoked his right to remain silent; consequently, no violation of the right occurred. We are constrained to agree that the record does not reflect that the Defendant invoked his right to remain silent. He is not entitled to relief on this basis.

## II.    Right to Substitute Counsel

The Defendant contends that the trial court erred by failing to inquire about the Defendant's reason for wanting substitute counsel appointed after the Defendant asked for another attorney at a pretrial hearing. He acknowledges that this issue was not raised in the court below and requests plain error review. The State responds that the record does not clearly establish what happened in the trial court, that no clear and unequivocal rule of law was breached, that the Defendant's substantial rights were not violated, and that consideration of the error is not necessary to do substantial justice.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;

 (b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Both the United States and the Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of counsel at trial. U.S. Const. amend VI; Tenn. Const. art. I § 9. However, this right "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with

appointed counsel." State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000); see Mobley v. State, 397 S.W.3d 70, 93 (Tenn. 2013). Put another way, the "essential aim" of the right to counsel "is to guarantee an effective advocate, not counsel preferred by the defendant." Id. An indigent defendant seeking the appointment of new counsel "must demonstrate 'good cause' to warrant substitution of counsel." State v. Parsons, 437 S.W.3d 457, 478 (Tenn. Crim. App. 2011) (quoting United States v. Iles, 906 F.2d 1122, 1130 (6th Cir. 1990)).

Once a defendant has made the trial court aware that he wants substitute counsel, the court should "afford the defendant an opportunity to explain his or her dissatisfaction with the present attorney." State v. Billy Kenneth Hall, No. E1999-02146-CCA-R3-CD, 2000 WL 1635492, at *9 (Tenn. Crim. App. Nov. 1, 2000). The court "must 'take particular pains in discharging its responsibility to conduct these inquiries concerning substitution of counsel. Perfunctory questioning is not sufficient. This is true even when the trial judge strongly suspects that the defendant's requests are disingenuous[.]'" State v. Ray, 880 S.W.2d 700, 703 (Tenn. Crim. App. 1993) (quoting United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982)).

Trial courts have wide discretion regarding the appointment and relief of counsel for indigent defendants, and a trial court's decision in such a matter "will not be set aside on appeal unless it is shown that there was a plain abuse of that discretion." State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). "Grounds upon which a trial court may order substitution of counsel include when counsel's representation is ineffective, when the defendant and counsel have become embroiled in an irreconcilable conflict, or when there has been a complete breakdown in communication between counsel and the defendant." Mobley, 397 S.W.3d at 93 (citing State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991)).[8] We apply a harmless error[9] standard to cases when the trial court failed to properly inquire into a defendant's request for substitute counsel. See, e.g., Ray, 880 S.W.2d at 704 (concluding that the error was harmless when the defendant received the effective assistance of appointed counsel); Hall, 2000 WL 1635492, at *9 (concluding that the defendant was not prejudiced by the court's denial of his motion to substitute counsel solely because jeopardy attached).

---

[8]As noted by the State, the Defendant relies on a four-part test derived from federal Sixth Circuit Court of Appeals cases involving a motion for substitute counsel, which has not been adopted by Tennessee courts; we decline to apply that test for the first time here. See Iles, 906 F.2d at 1130.

[9] The Defendant argues that he is not required to prove prejudice because the right to substitute counsel implicates the same structural constitutional error standard as the Sixth Amendment right to counsel. We agree with the State that the two issues are distinct.

At a May 15, 2018 status hearing, defense counsel noted that discovery was almost complete and requested that the case be reset so that counsel could review the discovery materials and provide them to the Defendant. The Defendant asked to address the trial court, and the following exchange occurred:

THE DEFENDANT: Yes, sir. I was under the impression that I wasn't completely (indiscernible). Actually, I gave them information they didn't even try to look into it. And more so, they are telling me that I have no other choice but to take a plea. And after discovery -- looking over my discovery and looking over the actual events that took place, I myself witnessed that why would I do that to myself, being that I got caught in a situation that wasn't really my fault[.]

    . . . .

So I was saying -- I was telling them I filed a complaint on them because I didn't feel like they were representing me --

THE COURT: And let me ask you something. I'm just -- I'm curious, sir. How far did you go in law school?

THE DEFENDANT: I ain't go at all.

THE COURT: How far did you go in college?

THE DEFENDANT: I didn't go at all.

THE COURT: How far did you go in high school?

THE DEFENDANT: My senior year.

THE COURT: Okay. Did you graduate?

    . . . .

THE DEFENDANT: No, sir.

THE COURT: Okay. Now while you were in high school, how many law courses did you take?

- 37 -

THE DEFENDANT:  I didn't take any.

THE COURT:  Okay. And how many times have you been charged with a criminal offense in the past?

THE DEFENDANT:  None.

THE COURT:  None.  So you don't have any experience, you don't have any education, you don't have any knowledge, but you think you know more about the law than these two lawyers?

THE DEFENDANT:  No, sir.

THE COURT:  Why don't you give them a chance to work on their case -- work on your case?  They're working hard.  They're going through all this stuff for you.  And what do you want to do in return?  File a complaint against them.  What did the complaint say?  That they don't know what they're doing?

THE DEFENDANT:  I said I didn't believe they had my best interest at heart.

THE COURT:  Because they didn't tell you what you wanted to hear?

THE DEFENDANT:  No, because --

THE COURT:  You know, your lawyer is gonna tell you what they think is in your best interest.  It may not be what you want to hear . . . . You want them to lie to you or do you want them to tell you the truth?

THE DEFENDANT:  I want them to tell me the truth.

THE COURT:  All right.  Give them a chance to work the case.  See you back in court.

        . . . .

THE DEFENDANT:  Excuse me, Judge.

THE COURT:  Yes, sir?

THE DEFENDANT:  How do I go about getting me another public defender?

- 38 -

THE COURT: You ask me. Go ahead, ask me.

THE DEFENDANT: May I have another public defender?

THE COURT: No. These are your lawyers. They're gonna be your lawyers. You don't get to pick your lawyer. Step out.

We think that this court's opinion in State v. Ladonte Montez Smith, Joe Davis Martin, and Shaun Fly Smith, No. M1997-00087-CCA-R3-CD, 1999 WL 1210813, at *14 (Tenn. Crim. App. Dec. 17, 1999), is instructive. In Smith, co-defendant Shaun Fly Smith expressed dissatisfaction with his counsel in a jury-out hearing during voir dire, stating that counsel was "trying to get [him] to turn State." Id. at *14. The trial court told him that counsel was "competent and outstanding in the area of criminal defense" and cautioned that he should keep discussions with counsel confidential. Id. This court noted that "from a reading of the record, it appears that the defendant may have been cut short in expressing his grievances," but ultimately concluded that he was not prejudiced by any error in this regard. Id.

In this case, as in Smith, "we have serious reservations" that the trial court fully discharged its duty to inquire into the Defendant's request for substitute counsel. Id. Nevertheless, the record does not reflect that the Defendant suffered any prejudice as a result of this error—as the State observes, this hearing occurred before discovery was complete, and the Defendant appeared in court before trial and had ample opportunity to request a new attorney if he was still dissatisfied with his representation. The defense team mounted a vigorous defense, including filing and arguing a motion to suppress the Defendant's police statement and conducting thorough cross-examination and impeachment of the witnesses at trial. We note that during the Defendant's Momon colloquy, defense counsel indicated that the Defendant participated in his defense by choosing not to mount a self-defense claim, which counsel honored. Twelve counts of the indictment were dismissed in the motion for judgment of acquittal. Because the Defendant suffered no prejudice, his substantial rights were not affected, and consideration of the error is not necessary to do substantial justice. The Defendant is not entitled to plain error relief on this basis.

### III. Jury Instructions

The Defendant contends that the trial court erred by instructing the jury on criminal responsibility and by declining to instruct the jury on self-defense and facilitation. The State responds that the Defendant has waived this issue because he asked the court not to

- 39 -

issue a self-defense instruction and did not raise a jury instruction issue in his motion for new trial.

We agree that these issues have been waived for failure to include them in the motion for new trial. See Tenn. R. App. P. 3(e). However, we will examine them for plain error.

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020). "Questions involving the propriety of jury instructions are mixed questions of law and fact" which this court reviews de novo with no presumption of correctness. Id. (citing State v. Cole-Pugh, 588 S.W.3d 254, 259-60 (Tenn. 2019) (citing State v. Perrier, 536 S.W.3d 388, 396 (Tenn. 2017)).

### a. Criminal Responsibility

In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). An instruction results in prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

During a recess, the trial court provided the parties with the proposed jury instructions. Defense counsel asked the trial court to remove criminal responsibility because the testimony indicated that the Defendant was not "merely connected" to the fight and that the Defendant could not have been assisting Mr. Daniels and Mr. Johnson. Defense counsel noted that Mr. Daniels and Mr. Johnson denied asking the Defendant to bring the gun and that they did not know the Defendant well.

The trial court responded that the Defendant confessed to the shooting and that the shooter had been described differently and identified as multiple people. The court stated that the Defendant was there to act as protection and found that the Defendant or someone else shot the gun. The court noted the defense theory that someone other than the Defendant was the shooter or that there were two or more shooters.

The trial court ultimately issued the pattern jury instruction for criminal responsibility, which provides as follows:

The defendant is criminally responsible as a party to a criminal offense if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. A defendant is held criminally responsible for an offense committed by the conduct of another if the defendant either solicits, directs, aids, or attempts to aid another person to commit the offense and he is acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense.

A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

To find a defendant criminally responsible for the acts of another, it is not necessary that you find the defendant was present or that the defendant took a physical part in the crime; encouragement of the principal offender is sufficient. However, mere presence during the commission of the offense is not sufficient to support a conviction.

Before you find the defendant guilty of being criminally responsible for an offense committed by the conduct of another, you must find that all the essential elements of said offense has been proven by the state beyond a reasonable doubt.

See Tenn. Code Ann. § 39-11-402(2); see also T.P.I.—Crim. 3.01.

The record supports the trial court's conclusion that criminal responsibility was fairly raised by the proof in spite of the State's decision not to argue that theory of guilt. The voluminous witness testimony in this case was replete with inconsistencies as to the location and role of each young man in the Defendant's group, and several of the victims identified Mr. Daniels as the shooter in police lineups. Mr. Lucas indicated that he asked the Defendant to bring a gun, and the Defendant's police statement confirmed that he did

- 41 -

such. Even if the Defendant was not the shooter, the evidence fairly raised the possibility that he aided the shooter or promoted the shooting. No clear and unequivocal rule of law was breached by including the criminal responsibility instruction. Additionally, even if the instruction were issued in error, it would be harmless in light of the substantial evidence that the Defendant was the shooter. Therefore, consideration of any such error is not necessary to do substantial justice. The Defendant is not entitled to plain error relief on this basis.

### b. Facilitation

After the trial court indicated that it would instruct the jury on criminal responsibility, the Defendant requested that the court also instruct facilitation as a lesser-included offense. The court responded that it did not believe the "evidence [was] legally sufficient . . . to support facilitation" or that a reasonable jury would find facilitation rather than criminal responsibility. In support of this position, the court cited to State v. Robinson, 146 S.W.3d 469 (Tenn. 2004), in which our supreme court held that a facilitation instruction was not required when no reasonable jury could conclude that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility.

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). The facilitation statute applies to a person who provides substantial assistance in the commission of a felony, but who does so "without an intent to promote, assist in, or benefit from the commission of the felony." State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001).

In this case, in light of the substantial evidence of the Defendant's identity as the shooter and the fact that neither party argued facilitation to the jury, consideration of any error in failing to instruct facilitation is not necessary to do substantial justice. The Defendant is not entitled to plain error relief on this basis.

### c. Self-Defense

As a preliminary matter, we agree that in addition to failing to raise this issue in his motion for new trial, the Defendant has also waived it because he specifically asked the trial court not to issue a self-defense instruction. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

- 42 -

In this case, after the close of the State's proof and the motion for judgment of acquittal, the Defendant elected not to testify. Afterward, the following exchange occurred between the Defendant and defense counsel:

Q. And more specifically we talked about the jury instructions regarding self-defense.

A. And I don't believe that's necessary because I didn't fire any shots.

Q. Okay. And we've also discussed with you specifically the defense of others as a defense?

A. Yes, sir.

Q. And you do not want . . . that portion of the jury instructions to be proposed by the Judge?

A. No, sir.

The Defendant affirmed that he made the decision knowingly and voluntarily after speaking to his legal team. Subsequently, the trial court asked the State if it wanted an instruction on self-defense or defense of others. The prosecutor responded negatively. The court addressed the parties and asked if any attorney thought the evidence was sufficient to support a self-defense instruction, commenting:

Now, I realize the [D]efendant gave a statement saying I was acting in defense of myself and of my friend, but I'm cognizant of the fact that there are strategic matters that need to be decided but I'm just trying to see what the lawyers want me to do.

I will acknowledge that I have some question about whether the evidence is legally sufficient to support either one of those because of multiple reasons including the fact that only a taser was used by the other side and most of these people were shot in the back, it's kind of hard to claim self-defense when people are running away and you shoot them in the back.

Most of the people were unarmed, most of them were girls, and one of the people that got shot[,] the person stood over him and shot multiple times, and . . . I tell the jury in a self-defense or defense of another [instruction] . . . that the use of force must be reasonable under the circumstances and no more than necessary to defend.

And in this case I think my honest opinion is no reasonable jury would find self-defense. But on the other hand I've got this statement out where he claims he's in self-defense.

The court asked the Defendant if he intended to argue self-defense in closing. Defense counsel responded negatively, stating that the defense team was "respecting [the Defendant's] decision." The State noted its position that self-defense was not fairly raised by the evidence, and the court agreed.

We note that the failure to raise this issue was tactical—as defense counsel documented during the jury-out Momon hearing, the chosen defense theory was that the Defendant did not fire the weapon, and he specifically requested that the defense team not argue self-defense or defense of another. The Defendant has waived review and is not entitled to relief on this basis.

## IV.    Sufficiency

The Defendant contends that his identity as the shooter was insufficiently proven, arguing that the only conclusive identifications were made by accomplices with incentive to shift the blame to him and that the victims made inconsistent identifications, particularly the victims who identified Mr. Daniels as the shooter in photographic lineups conducted immediately after the shooting. The Defendant does not contest the remaining elements of the offenses. The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's

- 44 -

proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

In the light most favorable to the State, the evidence at trial reflects that Mr. Lucas called the Defendant, asked him to accompany Mr. Lucas to Zodiac Park to protect Mr. Daniels during a fight, and told the Defendant to bring a "strap" or weapon. The Defendant admitted to the police that he brought a 9 mm handgun to the park and that when he saw Mr. Daniels being tased, he fired into the air and then into the crowd. The Defendant thought that the gun was loaded with seventeen rounds, the same number of shell casings recovered at the crime scene. Analysis of the shell casings indicated that they were all fired by one gun. The witnesses' descriptions of the shooter varied, but most of them included that the shooter was wearing a red bandana over his face and a dark hoodie or jacket. The Defendant's statement established that he wore a black hoodie and covered his face with a red bandana during the shooting. In addition, Mr. Lucas, Mr. Daniels, and Mr. Johnson all identified the Defendant as the shooter.

The Defendant's argument relates to the witnesses' credibility and the weight of the evidence, not its sufficiency. Although the Defendant aptly notes the voluminous and contradictory testimony in this case, defense counsel thoroughly cross-examined the accomplices and victim-witnesses about their inconsistent identifications and descriptions of the shooter, as well as the accomplices' motivations to protect themselves and minimize their own culpability. The trial court instructed the jury regarding accomplice testimony,

identity, and criminal responsibility.  The jury had ample evidence with which to make a credibility finding for each witness.  By its verdict, the jury credited those witnesses who identified the Defendant as the shooter.  This court will not reweigh the evidence or disturb the jury's findings in this regard.  The evidence of the Defendant's identity was sufficient, and he is not entitled to relief on this basis.

## *V.* *Sentencing*

Relative to sentencing, the Defendant contends that (1) the length of his aggregate sentence is excessive; (2) the trial court erred by imposing partial consecutive service; and (3) his aggregate sentence is unconstitutional due to his being a minor at the time of the offenses.  The State responds that the trial court did not abuse its discretion in sentencing and that the Defendant's sentence does not violate established constitutional precedent.

At the sentencing hearing, several witnesses testified on the Defendant's behalf.  Former Whitehaven High School assistant principal Darla Young knew the Defendant during his tenure at there and described him as a "dream child that every parent would want" and a leader in the school.  She stated that the Defendant was dedicated to his studies, had no conduct problems, played football and baseball, and was preparing to be a "captain" on the baseball team.  She noted that the Defendant was on the honor roll and that in addition to athletics, he worked at Edible Arrangements.  The Defendant left school in the eleventh grade when he was arrested in this case.  When asked to give an opinion on the Defendant's integrity, Ms. Young said that she would leave her child with him.

Pastor Jesse Alston, Jr., testified that Ms. Malone was a member of his church and that he counseled the Defendant about once per week for the past year.  The Defendant discussed his goals with Mr. Alston, who opined that the Defendant had been honest with him.  He stated that the Defendant had "given [him] hope for the future" and taught him "to not judge books by covers."  Mr. Alston said that the Defendant had a desire to create change in the community and a drive to determine his next steps, including education and employment.  Mr. Alston noted the Defendant's "amazing gift" for music, including writing songs.  When asked by the trial court whether the Defendant recognized that he "had to do some serious jail time," noting the Defendant's statement in the presentence report that he was ready to go home, Mr. Alston responded affirmatively, but commented that the Defendant was "standing firm" on his "faith" that he was innocent.

Additional people submitted character letters to the trial court.  Melodye Montgomery-Owens, a family friend, wrote that the Defendant was protective of the women in his family, that he was intelligent and excelled in sports, and that he was a well-mannered young man who helped Ms. Montgomery-Owens with household work after her husband died.

- 46 -

Eddie Jones, the Defendant's uncle, wrote that the Defendant was a National Honor Society student who could have graduated high school early. Mr. Jones opined that the Defendant was the most trustworthy person he knew and that the Defendant took care of others in the family. Mr. Jones noted that in 2016, the Defendant lost a grandparent.

Patrinia Blakely wrote that she was the Defendant's teacher in second grade and that the Defendant was a friendly child who would diffuse conflict among his peers. She noted that in the sixth grade, the Defendant had the highest state standardized test score in his class and that he was an "MVP" in baseball. She stated that the Defendant kept his grades up while helping his teachers in the classroom and working at his mother's salon. Ms. Blakely said that the Defendant had worked since he was fifteen and that he had two part-time jobs in 2016. She also noted that the Defendant had sought educational opportunities in jail. The Defendant entered as exhibits certificates from the Books Behind Bars program, an anger management program, his general education diploma,[10] and high school senior portraits.

Jason Spicer wrote that he was a family friend and Internal Revenue Service employee. He described the Defendant as pleasant, smart, and interested in a music career.

Retired correction officer "W." Horton wrote that he was previously in charge of the jail warehouse and that the Defendant worked for him as a trustee for seven months. Mr. Horton stated that the Defendant was perceptive, mannerly, willing to learn, and generally an asset to the warehouse.

Shelby County Sheriff's Office warehouse manager Ryan Leech wrote that the Defendant worked hard and took on additional shifts and duties. He described the Defendant as an upbeat and pleasant person with integrity. Mr. Leech noted that before he agreed to write the character letter, he had officers "shakedown" the Defendant's cell for prohibited items and that no such items were found.

The presentence report reflected that the Defendant had no prior arrests or convictions, that he completed eleventh grade before his arrest, and that he had no alcohol or drug use, other than marijuana beginning at age sixteen to help him sleep. The Strong-R assessment rated him as a high risk to reoffend, noting high risk factors for aggression, residential concerns, employment, and education. Defense counsel noted at the sentencing hearing that some of the factors in the assessment arose from the Defendant's having been incarcerated for three years before the trial, such as not having a job or living independently.

---

[10] The diploma is dated December 9, 2015; this discrepancy was not addressed at the sentencing hearing.

The Defendant's statement in the presentence report was as follows:

I was just there and I feel like I was set up to the be the fall guy. I pray that there is justice and I am released. Even the victim[s] of this crime pray for the same. That should speak ton[s]. Why take a person who could place a positive impact in society in a dark room. Someone who could encourage those who are around . . . children to do the right thing. It's easy to be around bad company but when you find out how detrimental it is to you and not only your family but everyone['s] families that are involved, you start to think, "Who am I?" "What is my purpose?" ["]Is this situation to build me or is my life over?" I believe this situation is to build me and show me it's a[ lot] of people being guided by the wrong people. I believe my duty to provide a positive image and show that it's alright to do the right thing. It's only this obstacle in my way and as soon as I return home, I feel like eyes will be watching me and I can use that to persuade people to have optimistic thinking and be better than they were yesterday. Don't give up on dreams no matter how difficult it is to achieve it. It seems you have this mind set especially since the good people tend to find themselves in positions they never should have been in. May God place it on your heart to have faith in me being an asset as far as a positive influence in a community that needs as man[y] as possible. I realize the people who repeatedly go[] to jail are the ones who continuously gain freedom but by God might I be an exception. May I please be acquitted and released to my family and loved ones and those who need guidance. Thank you.

A handwritten note on the presentence report read, "not accepted resp—[.]"

The trial court noted that the Defendant was a Range I, standard offender. The court found that three enhancement factors applied: that the Defendant was a leader in the commission of an offense with two or more criminal actors, that the Defendant treated Mr. Turner with exceptional cruelty, and that the Defendant used a firearm relative to the convictions other than employing a firearm during the commission of a dangerous felony. See Tenn. Code Ann. § 39-40-114(2), (5), (9). The court stated that it only afforded "significant weight" to enhancement factor (2), finding that the Defendant "took the lead" at "some point" during the incident and that he was "certainly a leader when [he] started shooting[.]" The court also found that the Defendant had not admitted his guilt and that the court did not perceive any remorse in his presentence report statement.

The trial court considered in mitigation the Defendant's youth, his lack of a criminal history, the programs he completed in jail, the character witnesses, and his reputation at school. See Tenn. Code Ann. § 40-35-113(13). The court stated that the Defendant's failure to take responsibility factored "heavily" into his potential for rehabilitation. The

court recounted the Defendant's suppression hearing testimony that he armed himself with a 9 mm pistol, covered his face, hid, and started shooting when a "ruckus" began. The court noted that even though the Defendant believed someone else was the shooter, he was "not taking any responsibility[.]" The court said that although a potential for rehabilitation was always present for a young person, "[H]ow are we going to rehabilitate someone who doesn't even see that he did anything wrong?"

The trial court considered the evidence at trial and the sentencing hearing, the presentence report, the Strong-R assessment, the purposes and principles of sentencing, the nature and characteristics of the Defendant's conduct, the Defendant's statements, the enhancement and mitigating factors, and statistical information provided by the Administrative Office of the Courts. The court noted that Count 1, second degree murder, was enhanced by the Defendant's using a firearm and that Count 2, attempted first degree murder, was enhanced by Mr. Turner's being in a helpless position.

Relative to consecutive sentencing, the trial court found that the Defendant was a dangerous offender. The court stated that the circumstances of the offense were aggravated and that the Defendant showed "absolute indifference" to human life when he shot at least fifteen times into a crowd of people who were running away and stood over Mr. Turner and shot him. The court found that confinement was necessary to protect the public from the Defendant and that consecutive sentencing was reasonably related to the severity of the offenses.

The trial court ordered an effective 133-year sentence structured as follows:

| Count | Offense (Victim) | Sentence | Percent Service | Consecutive Sentencing |
|---|---|---|---|---|
| 1 | Second degree murder (Ms. Tello) | 22 years | 100% | Consecutive to Counts 2-6, 10, 26-30, 34; Concurrent to Counts 14-25, 38 |
| 2 | Attempted first degree murder (Mr. Turner) | 25 years | 85% | Consecutive to Counts 1, 3-6, 10, 26-30, 34 |
| 3 | Attempted second degree murder (Ms. Bumpous) | 10 years | 30% | Consecutive to Counts 1, 2, 4-6, 10, 26-30, 34 |
| 4 | Attempted second degree murder (Ms. Jones) | 10 years | 30% | Consecutive to Counts 1-3, 5, 6, 10, 26-30, 34 |

| 5 | Attempted second degree murder (Ms. Clasen) | 10 years | 30% | Consecutive to Counts 1-4, 6, 10, 26-30, 34 |
|---|---|---|---|---|
| 6 | Attempted second degree murder (Ms. Trentham) | 10 years | 30% | Consecutive to Counts 1-5, 10, 26-30, 34 |
| 10 | Attempted second degree murder (Ms. Farris) | 10 years | 30% | Consecutive to Counts 1-6, 26-30, 34 |
| 14 | Aggravated assault with a deadly weapon causing bodily injury (Mr. Turner) | 6 years | 30% | Concurrent to all counts |
| 15 | Aggravated assault with a deadly weapon causing bodily injury (Ms. Bumpous) | 6 years | 30% | Concurrent to all counts |
| 16 | Aggravated assault with a deadly weapon causing bodily injury (Ms. Jones) | 6 years | 30% | Concurrent to all counts |
| 17 | Aggravated assault with a deadly weapon causing bodily injury (Ms. Clasen) | 6 years | 30% | Concurrent to all counts |
| 18 | Aggravated assault with a deadly weapon causing bodily injury (Ms. Trentham) | 6 years | 30% | Concurrent to all counts |
| 19 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Stull) | 6 years | 30% | Concurrent to all counts |
| 20 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Cottam) | 6 years | 30% | Concurrent to all counts |
| 21 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Rutherford) | 6 years | 30% | Concurrent to all counts |
| 22 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Farris) | 6 years | 30% | Concurrent to all counts |
| 23 | Aggravated assault with a deadly weapon causing fear of bodily injury (Mr. King) | 6 years | 30% | Concurrent to all counts |

| | | | | |
|---|---|---|---|---|
| 24 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Cornett) | 6 years | 30% | Concurrent to all counts |
| 25 | Aggravated assault with a deadly weapon causing fear of bodily injury (Ms. Richardson) | 6 years | 30% | Concurrent to all counts |
| 26 | Employing a firearm during the commission of a dangerous felony (Mr. Turner) | 6 years | 100% | Consecutive to Counts 1-6, 10, 27-30, 34; Concurrent to Counts 14-25, 38 |
| 27 | Employing a firearm during the commission of a dangerous felony (Ms. Bumpous) | 6 years | 100% | Consecutive to Counts 1-6, 10, 26, 28-30, 34; Concurrent to Counts 14-25, 38 |
| 28 | Employing a firearm during the commission of a dangerous felony (Ms. Jones) | 6 years | 100% | Consecutive to Counts 1-6, 10, 26, 27, 29, 30, 34; Concurrent to Counts 14-25, 38 |
| 29 | Employing a firearm during the commission of a dangerous felony (Ms. Clasen) | 6 years | 100% | Consecutive to Counts 1-6, 10, 26-28, 30, 34; Concurrent to Counts 14-25, 38 |
| 30 | Employing a firearm during the commission of a dangerous felony (Ms. Trentham) | 6 years | 100% | Consecutive to Counts 1-6, 10, 26-29, 34; Concurrent to Counts 14-25, 38 |
| 34 | Employing a firearm during the commission of a dangerous felony (Ms. Farris) | 6 years | 30% | Consecutive to Counts 1-6, 10, 26-30; Concurrent to Counts 14-25, 38 |
| 38 | Reckless endangerment (all victims) | 2 years | 30% | Concurrent to all counts |

### a. Sentence Length

When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The

burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40- 35-114; (6) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40- 35-103(5); Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

The Defendant argues that the trial court "seemed to fail to apply" the enhancement and mitigating factors it considered, complains about "the random nature to which the court applied the factors," and states that the court's decision to order the maximum sentence in some counts but not others is "inconsistent." These contentions are not supported by the record. The trial court clearly discussed that it applied enhancement factor (2) to all of the convictions, enhancement factor (9) to Count 1, and enhancement factor (5) to Count 2. We note that misapplication or failure to apply an enhancement or mitigating factor alone is not grounds for reversing a sentencing decision. See Bise, 380 S.W.3d at 706. At any rate, the court ordered sentences of the same length for each type of offense. Relative to Counts 1 and 2, the court explained that it enhanced the sentences based upon different enhancement factors, which supported different outcomes for two discrete offenses. In particular, the court discussed multiple times the cruelty with which the Defendant treated

Mr. Turner, which supported a maximum sentence in that count. The court did not abuse its discretion in setting the length of the Defendant's sentence, and he is not entitled to relief on this basis.

### b. Consecutive Sentencing

The Defendant contends that the trial court erred by imposing partial consecutive sentences, arguing generally that consecutive service was not consistent with the purposes and principles of sentencing; specifically, he disputes the court's finding that the Defendant was a dangerous offender. In support of his argument, the Defendant submits that "the [c]ourt's directing a consecutive sentence is in contradiction with [its] initial reasoning and comments" regarding the Defendant's potential for rehabilitation, and he complains that the court's verbiage in calling the Defendant's lifestyle "anti-social" is unsupported by the record. The State responds that the court acted within its discretion.

When reviewing a trial court's imposition of consecutive sentences, a " presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

The imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1)) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also Bise, 380 S.W.3d at 705.

Here, consecutive sentencing was statutorily mandated for Counts 26-30 and 34, employing a firearm during the commission of a dangerous felony, and their respective underlying convictions for dangerous felonies in Count 2, attempted first degree murder, and Counts 3-6 and 10, attempted second degree murder. See Tenn. Code Ann. § 39-17-1324(e)(1). In addition, the trial court imposed partial consecutive sentencing based upon Code section 40-35-115(b)(4), that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in

- 53 -

which the risk to human life is high[.]" The court ordered concurrent sentences for the aggravated assault and reckless endangerment convictions.

When the imposition of consecutive sentences is based upon the trial court's finding the defendant to be a dangerous offender, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 938, 939 (Tenn. 1995); see also Pollard, 432 S.W.3d at 863-64; State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The court made the requisite findings in this case.

We cannot conclude that the trial court abused its discretion by imposing partial consecutive sentencing. The Defendant cites to no authority, and there is none, to support his claim that because the trial court discussed the Defendant's inherent potential for rehabilitation as a young person earlier in the sentencing hearing, the court could not then find that the Defendant satisfied the criteria set out in Wilkerson for a dangerous offender.

While we acknowledge the positive character references presented in sentencing, the Defendant's anti-social lifestyle is evident in the circumstances of the offense. The Defendant admitted to the police that he brought a firearm to a fistfight against people he did not know, and he shot repeatedly into the unarmed crowd as they fled from him. The Defendant killed Ms. Tello, shot Mr. Turner in the face and neck as he lay helpless on the ground, and fired again into Mr. Turner's back as he attempted to crawl to safety. Mr. Turner was paralyzed, and some of the victims had persisting pain from their wounds. Although the Defendant admitted to having brought a gun to the fight at the suppression hearing, the Defendant told the presentence report officer that he was a scapegoat for the offenses, and the trial court noted the Defendant's failure to accept any responsibility for his role in the incident. Moreover, he was rated a high risk to reoffend. The record supports the court's findings that the Defendant was a dangerous offender, that consecutive sentencing was reasonably related to the severity of the offenses, and that the sentence was necessary to protect the public. The trial court's imposition of partial consecutive sentencing was not an abuse of discretion, and the Defendant is not entitled to relief on this basis.

c. *Constitutionality of Aggregate Sentence*

The Defendant contends that his aggregate sentence of 133 years violates the Eighth Amendment proscription on cruel and unusual punishment due to his status as a minor at the time of the shooting. The Defendant cites the United States Supreme Court's holding in Miller v. Alabama, 567 U.S. 460 (2012), that a minor may not be subject to a mandatory life without parole sentence, and argues that "[a]lthough Tennessee's sentencing scheme does not appear to violate Miller per se, sentencing a juvenile to a

sentence that exceeds his lifetime seems to run contrary to the reasoning set forth in Miller and its progeny." The State responds that Miller is not applicable to sentences other than mandatory life without parole.

In Miller, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. at 465. The Court did not prohibit a sentence of life without parole for all juveniles convicted of murder. Id. at 479. Rather, the sentencer must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. A judge or jury must have the opportunity to consider mitigating circumstances before sentencing a juvenile to life without parole. Id. at 489. In 2016, the Court held that Miller applied retroactively. Montgomery v. Louisiana, 577 U.S. 190 (2016) (as revised Jan. 27, 2016). In Montgomery, the Court discussed Miller's holding as follows: "Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" Id. at 195 (quoting Miller, 567 U.S at 479 ).

Moreover, during the pendency of this appeal, the United States Supreme Court issued its opinion in Jones v. Mississippi, 141 S.Ct. 1307 (2021). The Court held that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" to satisfy Miller in cases when a juvenile commits a homicide and is subsequently sentenced to life without parole. Id. at 1313. The Court specifically rejected the defendant's argument that to impose a sentence of life without parole, the sentencer must also make an explicit or implied factual finding of "permanent incorrigibility." Id.

The Defendant's argument that his aggregate sentence "does not comport with recent rulings of the United States Supreme Court regardless of how the sentencing procedure is utilized" is without merit. Miller has no bearing on how a sentencing regime treats multiple convictions, and the trial court was well within its discretion to order consecutive sentencing in this case. See Tenn. Code Ann. § 40-35-115(b)(4) ("The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.").

This court has repeatedly declined to apply Miller outside the context of mandatory life without parole sentences. See, e.g., State v. LaVonte Lamar Douglas, No. W2020-01012-CCA-R3-CD, 2021 WL 4480904, at *24-25 (Tenn. Crim. App. Sept. 30, 2021) (concluding that Miller was not applicable to an aggregate sentence of life imprisonment); State v. Darious Fitzpatrick, M2018-02178-CCA-R3-CD, 2021 WL 3876968, at *8 (Tenn.

Crim. App. Aug. 31, 2021) (concluding that <u>Miller</u> was not applicable to an aggregate sentence of life plus twenty years); <u>Charles Everett Lowe-Kelly v. State</u>, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *1 (Tenn. Crim. App. Feb. 24, 2016) (concluding that <u>Miller</u> did not apply to two life sentences ordered to be served consecutively). We are not persuaded to break with well-established precedent to expand the parameters of the Eighth Amendment in this regard, notwithstanding the fact that the Defendant's sentence "may push, and possibly exceed, the bounds of his life expectancy[.]" <u>State v. Steven King</u>, No. W2019-01796-CCA-R3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020).

We wish to note that we have considered the Defendant's citations to United States Supreme Court jurisprudence regarding the special considerations applicable to juvenile offenders and their potential for rehabilitation. However, as stated above, the province of this court is to apply the law as it has been enacted by our legislature and interpreted by our supreme court, not to make unilateral changes to established precedent. The Defendant is not entitled to relief on this basis.

CONCLUSION

After consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE